**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | | |
|---|---|---|
| ANGELLA AGUILAR, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  8:18-cv-03953 |
| v. | ) | |
| | ) | |
| DAVID E. HARVEY BUILDERS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

I.   **PROPOSED FINDINGS OF FACT**................................................................1

   A.  Frank Marceron's Individual Employer Status......................................1

   B.  Harvey-Cleary's Joint Employer Status...............................................2

   C.  Plaintiffs' Dates and Hours of Work ...................................................7

   D.  Nonpayment of Plaintiffs' Wages .......................................................8

   E.  Frank Marceron's Counterclaim Against Jacinto Garcia......................10

II.  **PROPOSED CONCLUSIONS OF LAW** ..............................................11

   A.  Frank Marceron Was Plaintiffs' Individual Employer .........................12

   B.  Harvey-Cleary Was Plaintiffs' Joint Employer ...................................13

   C.  Plaintiffs Have Established the Amounts of Their Earned but
       Unpaid Wages......................................................................................22

   D.  Plaintiffs Are Entitled to Enhanced Damages for Defendants'
       Violations.............................................................................................23

   E.  Jacinto Garcia Was Not Plaintiffs' Employer......................................25

# I.    PROPOSED FINDINGS OF FACT

1.   David E. Harvey Builders, Inc. d/b/a Harvey-Cleary ("HC") was the general contractor for the construction of a Gold's Gym in Riverdale, Maryland ("the Project") during the period relevant to Plaintiffs' claims. Joint Ex. ("JX") 1 ¶ 1.

2.   HC and TSCG, Inc. ("TSCG") entered into a subcontract under which TSCG was to perform drywall installation and related work on the Project ("the Subcontract"). *Id.* ¶ 2.

3.   TSCG hired all eleven Plaintiffs—Aguilar, Baires, Chavarria, Ferrer, Garcia, Marroquin, Martinez, Panozo, Prado, Revelo, and Torres—to work on the Project. *See* ECF 112 at 14–16. TSCG employed Plaintiffs during the relevant period, including in January and February 2018. *Id.*

## A.  Frank Marceron's Individual Employer Status

4.   Frank Marceron was the sole owner of TSCG during the relevant period. JX 1 ¶ 3.

5.   "At all times," Marceron had and used the authority to oversee TSCG's daily operations, which included the authority to "bid all work, project manage all work, inspect all work, bill all work, order all materials, and hire all staff." Pls.' Ex. ("PX") 4 at 8, 14; PX 7 at 6, 13.

6.   Marceron approved Plaintiffs' hiring, set their wage rates, maintained their employment records, and signed their paychecks, all in connection with Plaintiffs' work on the Project. PX 4 at 8; PX 7 at 6; *see also, e.g.*, Trial Transcript Day 1 ("Tr.1") 53:24–54:10, 54:18–55:10, 96:8–13, 162:25–163:8, 188:25–189:18; Tr.2 62:16–20, 113:2–5; Tr.3 17:15–19, 48:19–49:1.

7.   Marceron supplied ladders, scaffolds, and other tools for Plaintiffs' work on the Project. Marceron periodically directed Plaintiffs Martinez and Torres to transport these tools from his home to the Project in his truck. Tr.2 73:8–18; Tr.3 22:4–13.

8.   Marceron was involved in managing TSCG's and Plaintiffs' work on the Project through February 20, 2018. Tr.4 141:21–142:24, 147:9–12. On that date, he emailed HC and referenced the ongoing work of "my super"—*i.e.* Plaintiff Garcia, who served as TSCG's foreman. PX 39 at

1. The same day, he ordered Garcia to gather his remaining coworkers and return TSCG's equipment to its office and stop work on the Project, which they did. Tr.1 93:20–24, 198:14–20.

### B. Harvey-Cleary's Joint Employer Status

9.     Marceron founded TSCG in 2017, the same year it entered into the Subcontract. Tr.5 93:4–5, PX 8 at HCB1000845. In the one year the company remained in operation, it spent approximately six months on the Project, from early October 2017 through late February 2018. Tr.5 93:6–9; Tr.1 77:24–78:4, 93:20–24. TSCG also performed work on another HC project, the Raytheon project in Sterling, Virginia. *See infra* ¶ 28. During the period of TSCG's work on the Project, it had only one other "very small" non-HC subcontract; the Project represented "almost the only revenue" TSCG was earning at the time. Tr.4 6:11–20; Tr.5 94:21–24. The Subcontract was worth approximately $293,000 at baseline and was "probably the largest contract" that TSCG secured during its existence. PX 8 at HCB1000845; Tr.4 136:4–9; Tr.5 93:25–94:4, 95:5–12.

10. The Subcontract (a) prohibited TSCG from employing "any unfit person or anyone not skilled in the task assigned him" or any "work persons to whose employment on the Project [HC] . . . object[s]," PX 8 § 3(e); (b) authorized HC to order TSCG to "dismiss any employee of [TSCG] who shall, in [HC's] opinion, be incompetent, unsuitable, or a hindrance to the progress of the work, whereupon, such individual shall be promptly discharged, and any individual so discharged shall not again be employed on any part of the Project without the written consent of [HC]," *id.*; (c) authorized HC to "pay [TSCG's] labor direct by paying each individual in person," *id.* § 5(i); (d) authorized HC to order TSCG to "supply . . .  a reasonable number of copies of any payroll journal, ledger or other record showing the date of payment, amount paid, and number of hours paid . . . , and the identity of all payees . . . in a format prescribed by [HC]," *id.* § 3(g); (e) required TSCG to "perform the Work expeditiously with adequate forces," *id.* § 6(a), and "provide sufficient manpower to meet project schedule," *id.* Ex. C ¶ 38; (f) provided that if TSCG "fail[ed]

2

to furnish skilled workers, suitable materials, supplies or adequate equipment," HC could "without notice and without fully taking over the work, expedite delivery of and procure and furnish such workers, materials, tools, supplies or equipment," *id.* § 6(h); and (g) required that TSCG "shall comply with the work hours assigned by the [HC] Superintendent," *id.* Ex. C ¶ 45(p). None of these terms are in the model construction subcontract published by the American Institutes of Architect ("AIA"), *see* PX 25, which HC Project Manager Mark Voce testified establishes "industry standards." Tr.5 5:4–9.

11. The Subcontract included two central terms that were not typical for HC's subcontracts and in fact had never been used before. Tr.4 83:11–21, 84:12–19, 130:22–131:4. First, the Subcontract provided that HC would pay directly for TSCG's materials through a joint check from HC to LW Supply, TSCG's sole materials supplier for the Project. *Id.* 82:15–83:10; PX 9. Second, instead of requiring monthly progress payments, the Subcontract required HC to pay TSCG biweekly, the length of a standard pay period, "for the labor." Tr.4 130:22–132:1, 168:6–20, 182:21–183:18. Pursuant to these terms, which also are not in the AIA model subcontract, *see* PX 25, HC issued TSCG two checks for each biweekly billing cycle on the Project—one for TSCG's materials and one for TSCG's labor. Tr.4 168:12–20, 182:21–183:18. TSCG requested these terms to ensure it had adequate cash flow, and in exchange, HC received a 5% discount on TSCG's bid. Tr.4 130:22–131:10; Tr.5 51:12–25, 109:3–110:9, 132:5–8.

12. HC purchased, through its own supplier, the frames and doors Plaintiffs installed. Tr.4 83:22–84:5. HC also supplied the forklift Plaintiffs used. JX 3 at 30:17–32:9; Tr.1 93:25–94:19.

13. HC controlled TSCG's and other subcontractors' access to the worksite. HC's Project Superintendent, Tim Cole, unlocked the site each morning and locked it each afternoon, and HC did not permit Plaintiffs to be on site without HC personnel. JX 3 at 16:15–17:8; Tr.1 62:25–63:4. To get on site, Plaintiffs displayed HC-branded badges on their vests and HC-branded stickers on

their hardhats. PX 10; PX 28; PX 29 ¶ 4; Tr.1 56:20–58:10; Tr.2 69:13–21, 115:19–116:8, 153:4–16; Tr.3 18:25–19:15, 50:7–17, 85:1–13, 115:5–19, 131:21–132:2, 142:9–24; 168:18–169:3; Tr.4 194:5–10.

14. Cole "dictate[d] start and finish" times for Plaintiffs' workdays, requiring them to work on the Project from 5 a.m. to 1:30 p.m. with a 30-minute break. JX 2 at 171:1–22; PX 29 ¶ 2.

15. HC maintained records of Plaintiffs' attendance and time, as well as the work they performed each day. HC required Garcia, as TSCG's foreman, to complete a Subcontractor's Daily Report, in which he reported the number of TSCG workers on site and the tasks they had completed that day, *e.g.* "finishing free weights [and] lower walls, sanding Gold's fit and [G]old's burn walls, hanging plywood at IT room." PX 17; Tr.1 92:20–93:14. HC also required Plaintiffs to sign in daily with their names and HC-assigned unique hardhat numbers on a "JSA" form. PX 29 ¶ 5; HC Ex. ("HX") 2 Ex. A1; JX 3 at 61:21–62:16. HC collected the Subcontractor Daily Reports and JSAs, and recorded TSCG's tasks performed and manpower—the number of its workers on site and the hours each worked—in Daily Logs. Tr.1 93:13–14; JX 3 at 62:17–65:6; PX 14; HX 9.

16. HC created "lookahead schedules" to assign TSCG to complete specific tasks by certain deadlines. JX 2 at 153:5–17; JX 3 at 25:10–19. For example, HC's February 12, 2018 lookahead schedule required TSCG to, *inter alia*, "finish drywall" from February 12–17 and "install aluminum door frames" from February 14–17. PX 11 at HCB1000842. HC never asked Garcia or anyone else from TSCG to provide input on the nature or scheduling of the tasks HC assigned. Tr.1 70:7–72:8. TSCG had to adhere to deadlines in the lookahead schedules; Garcia could not decide that TSCG's work should be done in a different manner or order. Tr.1 72:9–11. When HC concluded that TSCG was falling behind the lookahead deadlines, it supplemented TSCG's workforce with additional labor. PX 11 at HCB1000841; Tr.4 139:2–140:5.

17. HC supplied project documents and shop drawings that specified the type of finish, "screw

spacing," "taping and spackling requirements at joints," "screw pattern[s]," and other particulars for TSCG's installations. JX 2 at 178:3–179:8; JX 3 at 54:5–56:2. Plaintiffs had to comply with these standards; otherwise, Cole directed them to "redo that section or area." JX 2 at 179:9–19.

18. Cole supervised Plaintiffs' work daily. Each morning, he met with Garcia to provide instructions on the day's tasks, which Garcia translated into Spanish for the other Plaintiffs. Tr.1 62:17–24, 63:5–13, 66:1–10, 72:12–18; Tr.2 71:7–72:2, 118:1–24. Cole then walked the site "all day long" to inspect the work being done, including Plaintiffs' work, in addition to looking for safety violations. JX 3 at 49:19–50:3; Tr.1 67:4–68:2; Tr.2 118:4–9; Tr.3 87:1–5.

19. Additionally, HC required Garcia to attend weekly meetings, along with other subcontractor foremen, to report on their progress and receive additional direction. JX 3 at 35:9–36:7, 42:1–45:21, JX 2 at 153:18–154:6; PX 27 at HCB4002526, HCB4002528, HCB4002532, HCB4002537; Tr.1 61:25–62:1, 68:16–24, 70:1–6. In Cole's words, these meetings were a necessary means of "herd[ing] these guys"—the subcontractors—"in a line." JX 3 at 42:10–17.

20. Cole sometimes provided instructions directly to other Plaintiffs who spoke some English. For example, he instructed Aguilar on where and how to put in caulking; he directed and supervised Chavarria and others to move furniture into an office; and he supervised Martinez's installation of a bathroom ceiling. Tr.2 72:3–9, 119:10–21; Tr.3 21:13–22:3, 86:10–25.

21. Cole also instructed Plaintiffs to redo work that had been damaged or that did not meet his expectations. For example, he directed Plaintiffs to redo installation work in the sauna and directly instructed Chavarria to move a wall. Tr.1 68:3–13; Tr.2 119:22–120:3; Tr.3 51:17–52:5, 80:14–17. Cole also told Plaintiffs when their work met his expectations. Tr.2 72:17–73:7, 118:25–119:7.

22. Plaintiffs had to secure written permission via a "hot work permit" signed by Cole before doing certain types of work, like cutting metal. PX 12; Tr.1 65:16–25. The permit specified the date, time, and location of the work, along with which worker could perform it. *See* PX 12.

5

23. HC required all Plaintiffs to attend weekly safety meetings on the Project. Tr.5 35:8–36:20; *see also, e.g.*, PX 27 at HCB4002530–31, HCB4002533–34.

24. HC directed Plaintiffs to work extra time to meet the Project's substantial completion deadline. In January 2018, Vice President Joe LaFonte directed Cole to "push" subcontractors, like TSCG, to work 6 or 7 days per week. *See* PX 24 at 1. Cole, in turn, directed Plaintiffs to work some 10- to 12-hour days and Saturdays. JX 3 at 110:14–20; Tr.1 79:3–16; Tr.2 113:22–114:7.

25. HC further required TSCG to "provide more manpower" to meet lookahead schedule deadlines. JX 3 at 175:9–20. For example, on January 23, 2018, Cole advised his HC colleagues that TSCG only had 10 workers on site and asked them "to speak with their counterparts at the drywall contractor . . . about having full crews." JX 3 at 106:19–110:20; PX 15. Another time the same month, Voce expressed concern to TSCG project manager Bob Perrone that TSCG had "only 7" field staff on site, prompting Perrone to promise to add workers. PX 35 at 1; Tr.5 9:24–12:11.

26. Conversely, HC sometimes directed TSCG to reduce the number of its workers to limit costs. JX 3 at 125:20–129:22.

27. HC also had and used the authority to permanently remove subcontractor employees from the Project, including TSCG's, when they did not conduct themselves according to HC's expectations. On one occasion, HC removed a TSCG worker for what HC saw as a safety violation, *see* PX 19, while on another, HC had a different subcontractor's employee removed for "arguing and cursing," *see* PX 18. Whether to permanently remove a subcontractor employee was Cole's "call," which subcontractor management had no authority to challenge. JX 2 at 247:16–21.

28. Voce also directed two Plaintiffs' work on HC's Raytheon project. When Raytheon needed "quick work" in January 2018, Voce had Perrone send TSCG's employees to do the task. PX 36 at 213:3–12; PX 21. Voce supervised Plaintiffs Martinez and Torres on the assignment, directing them to the Raytheon site one afternoon and on a Saturday, providing instruction on the elevation

6

at which to install ceiling tiles, and confirming they had done the work to his satisfaction. Tr.2 74:16–76:4, Tr.3 22:14–23:18. Garcia was not present. Tr.2 75:20–22; Tr.3 23:10–12.

### C.  Plaintiffs' Dates and Hours of Work

29. Each day they worked on the Project, Plaintiffs signed their names to individual timesheets, and Garcia wrote in their hours. Tr.1 84:9–13, 87:8–23; PX 20-B–20-L. Garcia was able to verify those hours because he was almost always present at the job site with the other Plaintiffs; on the rare occasion he was not, Plaintiff Martinez verified his coworkers' hours. Tr.1 82:24–84:22, 87:20–89:16; Tr.2 58:8–16, 125:21–23.

30. At the end of the week in which the work was performed, Garcia created summary timesheets based on the individual timesheets. Tr.1 89:17–90:11; PX 20-A. Garcia sent copies of the weekly summaries to TSCG's bookkeeper Sarah Haislipp by email and then delivered the original copies of the individual timesheets and weekly summaries to TSCG's office. Tr.1 90:12–91:22; Tr.2 57:21–25; Tr.4 5:19–20, 17:18–18:7, 55:7–24. Haislipp submitted the time records to Marceron, who approved the paperwork before issuing paychecks. Tr.4 58:9–23. Although Haislipp did not recall receiving timesheets from Garcia in February 2018, Marceron had access to her TSCG email account and had previously deleted emails from her account. Tr.4 76:8–78:19.

31. Plaintiffs' dates and hours of work on the Project in January and February 2018 are accurately reflected in the weekly summary sheets.[1] Tr.1 89:17–90:11; PX 20-A.

---

[1] Defendants failed to undermine the accuracy of the individual timesheets and weekly summaries. Garcia credibly testified that some Plaintiffs did not always sign the HC forms, but that he and the other Plaintiffs "would be sure to sign the [TSCG] time sheets" each workday because "they knew that their payment depended on that." Tr.2 44:16–46:23. While HC pointed out minor discrepancies between the timesheets/summaries and HC's JSAs and daily logs, HC's forms largely corroborate the TSCG forms at least with respect to attendance and hours worked. *See* HX 2; HX 9. For example, HC's Daily Logs reflect that TSCG consistently had several workers on the Project for at least 8 hours Monday through Friday—plus at least some Saturdays—through late February 2018. *See* HX 9. HC further failed to prove that its forms are somehow more reliable

32. Plaintiffs' dates of work were as follows: Aguilar, 1/23/18 – 2/20/18, Tr.3 82:21–23, 88:18–20; Baires, 10/17 – 2/16/18, Tr.3 167:2–4; Chavarria, 10/17 – 2/9/18, Tr.2 112:21–113:1; Ferrer, 12/17 – 1/30/18, Tr.3 129:24–130:2; Garcia, 10/17 – 2/20/18, Tr.1 77:24–78:2, 93:20–22; Marroquin, 10/17 – 2/9/18, Tr.3 48:16–18; Martinez, 11/17 – 2/2/18, Tr.2 62:10–15; Panozo, 12/17 – 2/20/18, Tr.3 140:13–20; Prado, 1/22/18 – 2/2/18, Tr.3 113:18–21; Revelo, 1/2/18 – 2/6/18, Tr.2 151:3–5; and Torres, 11/17 – 2/20/18, Tr.3 17:4–11; *see also* PX 20-A.

33. Plaintiffs each worked the hours Cole assigned on the Project: generally 8 hours per weekday, from 5:00 a.m. to 1:30 p.m. with a half-hour lunch break. PX 29 at ¶ 2. Occasionally, some worked longer hours or additional days. *See* PX 20-A.

34. Plaintiffs' hourly pay rates on the Project were as follows: Aguilar, $22, Tr.3 83:11–15; Baires, $20, Tr.3 167:5–7; Chavarria, $23, Tr.2 113:2–3; Ferrer, $14, Tr.3 130:3–5; Garcia, $30, Tr.1 54:6–8; Marroquin, $21, Tr.3 48:19–20; Martinez, $25, Tr.2 62:16–18; Panozo, $21, Tr.3 140:21–23; Prado, $22, Tr.3 113:22–23; Revelo, $15, Tr.2 151:8–10; and Torres, $25, Tr.3 17:12–14;[2] *see also* PX 26 (corroborating Plaintiffs' regular and overtime hourly rates).

### D.  Nonpayment of Plaintiffs' Wages

35. Plaintiffs received no pay for their work on the Project in January and February 2018. Tr.1 93:15–19; Tr.2 52:6–10, 77:5–16, 120:9–17, 154:19–21; Tr.3 23:19–23, 87:6–8, 116:16–18, 132:3–7, 144:23–145:7, 169:4–24. Although Perrone, accompanied by Garcia, presented the other Plaintiffs with TSCG checks dated January 31, 2018 with pay for some weeks that month, PX 26, Marceron had directed Perrone and Garcia not to distribute the checks because they lacked funds.

---

than the TSCG timesheets/summaries; indeed, LaFonte admitted that there are discrepancies between HC's own JSA forms and daily logs, with the daily logs at times significantly undercounting the number of workers present on the job site. Tr.4 90:23–95:1.

[2] There appears to have been a mistranslation or error in transcribing Mr. Torres' response regarding his hourly rate. While the transcript indicates his response was "$35," Plaintiffs recall Mr. Torres testified to a $25/hour rate, as shown in a TSCG check made out to him. *See* PX 26-E.

Tr.2 77:17–79:3, 120:18–121:17, 154:22–155:22; Tr.3 23:24–24:11, 52:11–53:5, 87:15–88:8, 94:20–96:23, 132:8–133:5, 169:15–170:2.

36. Marceron knew that Plaintiffs were working without pay. Some Plaintiffs complained directly to him and Perrone, who explained that Plaintiffs had not been paid because HC had not paid TSCG for various change orders. Tr.1 97:7–14; Tr.2 82:4–15. Marceron stated that he was preparing paperwork to receive the payment due. Tr.1 97:11–14.

37. HC also knew that Plaintiffs were working without pay. Tr.4 105:23–108:6. Several Plaintiffs participated in and/or were present for a conversation about their unpaid wages with Voce, who assured those Plaintiffs that they would be paid and urged them to continue working.[3] Tr.1 98:21–25, Tr.2 80:5–14, 122:5–19; Tr.3 145:22–146:4; PX 37 at 103:2–22; PX 38 at 105:6–106:17. Several Plaintiffs also complained about their unpaid wages to Cole, who responded that HC had paid TSCG but that he would look into the matter. Tr.1 97:15–98:9, Tr.2 81:10–25, Tr.3 145:8–19. Cole assured Plaintiffs that they would be paid and that the checks were delayed due to bad weather. Tr.2 121:18–122:4, Tr.3 63:11–17. In addition, on February 16, 2018, LaFonte received an email from Haislipp attaching written demands from each Plaintiff for payment of several weeks of uncompensated labor on the Project. Tr.4 201:2–202:14.

38. Plaintiffs Panozo and Baires previously received $3,840.00 and $4,160.00, respectively, of their unpaid wages on the Project as consideration for the settlement of a mechanic's lien they filed against entities that are not parties to this case. Tr.5 154:4–156:6; PX 40. That settlement did not release any of the Defendants. Tr.5 156:20–157:4.

39. Multiplying each Plaintiff's uncompensated regular and overtime hours by their regular

---

[3] While Voce claimed at trial not to recall with whom he spoke regarding the nonpayment of wages, he did not deny having spoken with TSCG employees directly. Indeed, he equivocated that "[i]t could be" that he "potentially" told TSCG employees that he would attempt to get the payment issues resolved, after being confronted with his prior deposition testimony. Tr.5 19:11–21:13.

Case 8:18-cv-03953-GLS   Document 163   Filed 07/03/23   Page 12 of 28


and overtime rates, respectively, and accounting for any offsets due to the mechanic's lien settlement, Plaintiffs are owed the following in unpaid wages: Aguilar: $3,168.00; Baires: $1,240.00; Chavarria: $5,290.00; Ferrer: $2,212.00; Garcia: $9,165.00; Marroquin: $4,494.00; Martinez: $8,000.00; Panozo: $1,137.00; Prado: $1,738.00; Revelo: $3,075.00; and Torres: $7,750.00. Plaintiffs testified at trial to approximations of these amounts.

40. Marceron's failure to pay the amounts owed was not due to a disagreement as to Plaintiffs' entitlement to the money. Marceron never told any of the Plaintiffs they were not legally entitled to their wages. Tr.1 99:12–17; Tr.2 82:16–19, 123:7–10, 156:6–8; Tr.3 24:25–25:3, 53:16–19, 88:21–23, 116:25–117:2, 133:15–17, 146:22–25, 171:5–7.

41. HC's failure to pay the amounts owed was not due to a disagreement as to Plaintiffs' entitlement to the money. HC never told any of the Plaintiffs they were not legally entitled to their wages. Tr.1 99:18–24; Tr.2 82:20–23, 123:11–14, 156:9–12; Tr.3 25:4–7, 53:20–23, 88:24–89:2, 117:3–6, 133:18–21, 147:1–4, 171:8–10. Further, although the Subcontract permitted HC to review TSCG's payroll to determine the validity and amount of Plaintiffs' claims, HC did not do so. Tr.4 195:16–196:11. HC conducted no investigation of the claims prior to this litigation. Tr.4 197:9–22. Instead, LaFonte asserted that because Plaintiffs were employees of TSCG, "we owe them nothing" and he was "not entertaining any of it." Tr.4 108:11–14, 203:23–204:14.

42. HC did not directly hire or contract with either TSCG's second-tier subcontractors or with Plaintiffs. Tr.4 96:18–21. From HC's perspective, there was no difference between the second-tier subcontractors and TSCG's direct employees. JX 2 at 202:1–9; Tr.4 96:22–25. Nonetheless, HC sought to pay and did in fact pay at least some of TSCG's second-tier subcontractors for their work on the Project after these entities notified HC—through counsel—that they had not been paid and filed liens against the property. Tr.4 97:5–98:16, 104:1–19, 108:15–19; JX 2 at 215:19–216:7.

**E.  Frank Marceron's Counterclaim Against Jacinto Garcia**

43. Garcia lacked authority to hire TSCG employees and had to seek approval from Marceron for all proposed hires. Tr.1 55:4–6.

44. Garcia lacked authority to set TSCG employees' wage rates. Tr.1 55:7–10. He also lacked authority to issue TSCG checks and did not sign any Plaintiff's paycheck. Tr.1 96:25–97:2.

45. All Garcia's work on the Project was authorized by TSCG. In January 2018, Marceron directed Garcia to stop work on "change orders" (*i.e.* work beyond the Subcontract's scope), which Garcia did, but he did not direct Garcia to leave the Project. Tr. 1 177:5–179:17.[4] Perrone confirmed Garcia should keep working, and he and other Plaintiffs did so with Marceron's knowledge. *Id.* Garcia left the Project on February 20 at Marceron's direction. Tr.1 93:20–24.

46. None of the other Plaintiffs ever quit working for TSCG to work directly for Garcia on the Project. Tr.2 77:2–4, 122:20–22, 155:23–25; Tr.3 24:12–14, 53:9–11, 88:9–11, 116:19–21, 133:6–8, 144:20–22, 170:3–5.

## II.      PROPOSED CONCLUSIONS OF LAW

The Fair Labor Standards Act ("FLSA") aims to "protect 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'" *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)). It is a "'remedial and humanitarian'" statute which "should be . . . interpreted and applied to effectuate its goals." *Id.* To effectuate its humanitarian goal, the FLSA broadly defines "employ" to "include[] to suffer or permit to work." 29 U.S.C. § 203(g). The statute uses similarly inclusive language to define an "employer" as "any

---

[4] Marceron Ex. 20, Jacinto Garcia's response to TSCG's Interrogatory #5, does not contradict his trial testimony. In response to that interrogatory, Garcia simply stated that "At one point, around the middle of January 2018, Frank *suggested* to Plaintiff that he and his co-workers could leave the project if they did not get paid. TSCG Project Manager Perrone disagreed and said that they should keep working" (emphasis added).

person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." and an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(d) and (e). Together, the definitions of "employ," "employee," and "employer" establish an understanding of employment that goes well beyond that reflected in the common law of agency or in other statutes. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). A "broader or more comprehensive coverage of employees . . . would be difficult to frame." *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945); *see also Darden*, 503 U.S. at 326 (noting the "striking breadth" of the FLSA's view of employment). Maryland's Wage and Hour Law ("MWHL") and Wage Payment and Collection Law ("MWPCL") share the FLSA's remedial purpose and its expansive understanding of employment. *See, e.g.*, *Newell v. Runnels*, 967 A.2d 729, 771–72 (Md. 2009); *Qun Lin v. Cruz*, 239 A.3d 720, 736 (Md. Ct. Spec. App. 2020).

### A.  Frank Marceron Was Plaintiffs' Individual Employer.

An officer of a corporate entity is personally liable for the unpaid wages of the entity's employees if he exercises "operational control of significant aspects of the corporation's day to day functions." *Rivera v. Mo's Fisherman Exch., Inc.*, ELH-15-1427, 2018 WL 2020423, at *9 (D. Md. May 1, 2018); *accord Qun Lin*, 239 A.3d at 735–37. The individual's authority to hire and fire, determine the rate and method of payment, supervise the conditions of employment, and maintain employment records are all factors in the individual liability analysis. *Holden v. Bwell Healthcare, Inc.*, BPG-19-760, 2021 WL 5827898, at *10 (D. Md. Dec. 7, 2021).

Marceron had "operational control" of TSCG's day to day functions and was Plaintiffs' individual employer in light of the facts set forth at I.A *supra*. Further, the law-of-the-case is that TSCG—and thus, Marceron, its sole owner and operator—remained on the Project through February 20, 2018, the end of the period of Plaintiffs' uncompensated work. ECF 112, 113. Marceron was thus Plaintiffs' employer during the relevant period.

12

### B.  Harvey-Cleary Was Plaintiffs' Joint Employer.

Joint employment exists under the FLSA and its state analogs where "two or more persons or entities are 'not completely disassociated' with respect to a worker such that [they] share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of the worker's employment." *Salinas v. Comm'l Interiors, Inc.*, 848 F.3d 125, 141 (4th Cir. 2017). Joint employers are jointly and severally liable for wage violations suffered by those they employ jointly.  *Id.* at 134. The Fourth Circuit considers six factors to determine whether entities are joint employers:

> (1) whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means; (2) whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment; (3) the degree of permanency and duration of the relationship between the putative joint employers; (4) whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer; (5) whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; (6) whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.  *Id.* at 141–42.

Courts do not apply the *Salinas* factors in a "narrowly formalistic" manner. *McCoy v. Transdev Servs.*, *Inc.*, DKC 19-2137, 2022 WL 951996, *9 (D. Md. Mar. 30, 2022). Thus, "[t]he absence of any one factor . . . is not dispositive as to whether a joint employment relationship exists." *Id*. at *7. Ultimately, entities are joint employers if—considering the factors holistically—they are not "entirely independent" or "completely disassociated" from one another with respect to the work at issue. *Salinas*, 848 F.3d. at 141–42; *see also Hall v. DirectTV LLC*, 846 F.3d 757, 770 (4th Cir. 2017) (an entity "must only play a role in establishing the key terms and conditions of the worker's employment" to be a joint employer). Application of the *Salinas* factors reveals that HC and TSCG

13

were not "completely disassociated" with respect to Plaintiffs' work on the Project, and HC "play[ed] a role in establishing the key terms and conditions of [Plaintiffs'] employment."

***Power to direct, control, or supervise the worker:*** HC had and used the power to "direct, control, or supervise" Plaintiffs' work on the Project. Its lookahead schedules, which it created without input from TSCG, required Plaintiffs to complete specific tasks on specific dates. HC denied TSCG and Plaintiffs the freedom to time or sequence their work differently. HC also directed TSCG and Plaintiffs as to *how* to do the work it assigned. It supplied project documents and shop drawings detailing requirements for screw patterns and spacing, taping and spackling requirements, and finish type. The high level of specificity with which HC directed Plaintiffs' performance is strong evidence of HC's shared power with TSCG to supervise Plaintiffs. *Hall*, 846 F.3d at 772 (allegations that plaintiffs had "to follow particularized methods and standards of installation to assure [defendant's] equipment is installed according to the dictates of [defendant's] policies and procedures" supported joint employment); *Young v. Act Fast Delivery of W. Va., Inc.*, 5:16-cv-09788, 2018 WL 279996, *6 (S.D.W.Va. Jan. 3, 2018) (defendant jointly employed plaintiff drivers where it "determined what routes would be driven and the times deliveries would occur" and "controlled when, where, and how [plaintiffs] made deliveries").

HC took active steps each day to ensure TSCG and Plaintiffs specifically complied with its requirements. Every morning, Cole met with Garcia to communicate Plaintiffs' daily tasks, which Garcia translated into Spanish for his co-Plaintiffs. Garcia had no authority to diverge from HC's instructions. *See McCoy*, 2022 WL 951996, *7 (entity was a joint employer where it "exercise[d] control over the creation" of daily assignments and thereby "dictated [p]laintiff [d]rivers' workdays"). Cole then walked the site "all day long" to monitor and document whether Plaintiffs and other workers were performing HC's assigned tasks on HC's required schedule. Cole inspected Plaintiffs' work and directly instructed those who spoke some English on tasks such as

14

caulking, ceiling installation, and moving furniture. *See Salinas*, 848 F.3d at 146, 148 (finding joint employment where contractor "engaged in daily oversight of [p]laintiffs' work and provided regular feedback and instruction, through [subcontractor] supervisors" and "actively supervised [p]laintiffs' work on a daily basis by having foremen walk the jobsite and check [p]laintiffs' progress"); *Lima v. MH & WH, LLC*, 5:14-CV-896-FL, 2019 WL 2602142, *3 (E.D.N.C. Mar. 8, 2019) (general contractor was joint employer where one of its managers "visit[ed] construction sites to check on the quality of work performed by subcontractors"); *Lemus v. Timberland Apts., LLC*, 3:10-cv-01071, 2011 WL 7069078, *14 (D. Or. Dec. 21, 2011) (general contractor was joint employer where it "maintained a frequent presence at the work site, and retained the right to inspect work both while it was being done and after it was finished"). Plaintiffs also had to get written permission from Cole to perform certain tasks, like cutting metal. Cole specified in the permit who was to perform the task, on what date, and during what time.

If Plaintiffs' work did not "comply with" HC's project drawings or standards, Cole directed them to "redo that section or area." For instance, he ordered Plaintiffs to redo paneling in the sauna and to move a wall. *See Salinas*, 848 F.3d at 146 (general contractor jointly employed plaintiffs where it "could—and did—require [p]laintiffs to redo work that [the general contractor] found deficient"); *Lima*, 2019 WL 2602142, *3 (general contractor who instructed subcontractors to "change" or "fix" work was a joint employer).

Likewise, HC controlled TSCG's "manpower" on the project. The Subcontract required TSCG to supply "adequate forces" to complete the drywall installation on HC's timeline and according to its standards. Rather than leaving TSCG to determine the adequacy of its staffing, HC made that assessment, and ordered it to "provide more manpower" on the job—*i.e.* the presence of additional Plaintiffs—when necessary to keep on schedule. *See Salinas*, 848 F.3d at 146 (general contractor was joint employer where it communicated "staffing needs" to subcontractor); *Antenor v. D & S*

15

*Farms*, 88 F.3d 925, 934 (11th Cir. 1996) (finding agricultural grower a joint employer under where it told labor contractor "how many farmworkers to bring each day"), *cited in Salinas*, 848 F.3d at 148. HC also ordered fewer workers at times to save costs.

HC also exercised its supervisory authority over Plaintiffs by requiring their participation in various meetings each week. These included weekly safety meetings for all Plaintiffs, and weekly field meetings that Garcia attended where HC personnel discussed work progress and "herd[ed] [subcontractor foremen] in a line." *See Salinas*, 848 F.3d at 146 (citing defendant's "frequent mandatory meetings," including sitewide safety meetings, as support for joint employment); *Lima*, 2019 WL 2602142, *21 (general contractor's requirement that subcontractor workers attend weekly safety meetings evidenced joint employer status).

Finally, HC required Plaintiffs to hold themselves out as HC employees by mandating that they display badges on their vests and stickers on their hardhats emblazoned with HC's (and not TSCG's) name. *See Salinas*, 848 F.3d at 146 (general contractor jointly employed plaintiff subcontractor employees where it "provided [p]laintiffs with stickers bearing the [general contractor] logo to wear on their hardhats and vests bearing [general contractor] logos to don while working on [general contractor] jobsites"); *Hall*, 846 F.3d at 772 (defendant jointly employed plaintiffs where plaintiffs had to "display the [defendant] company's logo on their vehicles" and "carry . . . identification cards" containing defendant's name).

***Power to hire, fire, or modify the terms or conditions of employment:*** HC had the power to hire, fire, and modify the terms or conditions of Plaintiffs' employment. The Subcontract: (a) prohibited TSCG from hiring on the Project "work persons to whose employment on the Project Contractor [*i.e.*, HC] . . . object;" (b) required TSCG to "dismiss any employee of [TSCG] who shall, in Contractor's opinion, be incompetent, unsuitable, or a hindrance to the progress of the work, whereupon such individual shall be promptly discharged. . . ."; and (c) required that TSCG "shall

16

comply with the work hours assigned" by HC. With these terms, HC retained decision-making power with respect to (a) selection, hiring, and approval of new employees, *see Hall*, 846 F.3d at 773 (plaintiffs adequately alleged that general contractor was a joint employer where it set forth "hiring criteria" for subcontractor's employees); (b) termination and reassignment of employees, *see id.* (allegation that general contractor "used its centralized work-assignment system to effectively terminate technicians by ceasing to assign them work" supported joint employment); *Lima*, 2019 WL 2602142, at *22 (finding joint employment where general contractor "could demand that [subcontractor] prohibit a laborer, who might be causing problems on the jobsite, from ever returning to the project"); *Young*, 2018 WL 279996, *7 (pharmacy jointly employed courier's drivers where "upon receiving complaints from its clients regarding deliveries, [pharmacy] directly communicated to [courier] its wishes to have those drivers reassigned or terminated"); and (c) conditions of employment such as work hours and scheduling, *see Young*, 2018 WL 279996, at *7 (pharmaceutical "prepared the daily schedules for" courier's drivers), *Elsayed v. Family Fare LLC*, 1:18-cv-1045, 2020 WL 780701, at *5 (M.D.N.C. Feb. 18, 2020) (declining to dismiss claim that franchisor company jointly employed plaintiffs with franchisee store where franchisor "dictat[ed] . . . when the store opened and closed"); *Lemus*, 2011 WL 7069078, at *19 (contractor who "set work hours" jointly employed plaintiffs with subcontractor).

While HC's "power" to hire, fire, and modify the terms and conditions of Plaintiff's employment is alone enough to resolve this *Salinas* factor in Plaintiffs' favor, *Salinas*, 848 F.3d at 141, HC also *used* its power to set Plaintiffs' schedules. Cole "dictate[d] start and finish" times for each workday. *See Elsayed*, 2020 WL 780701, at *5; *Young*, 2018 WL 279996, at *7; *Lemus*, 2011 WL 7069078, at *19. In addition, HC directed Plaintiffs to work extra hours and on weekends. *See Salinas*, 848 F.3d at 146 (general contractor whose "foremen told certain plaintiffs to work additional hours or additional days" was a joint employer with subcontractor).

Further, HC indirectly assigned two Plaintiffs to work on a project for another one of its clients, Raytheon. In January 2018, when Raytheon needed "quick work" on two occasions, Voce asked TSCG to send its employees to do the task. TSCG complied each time, indicating that Plaintiffs Martinez and Torres would perform the work. Voce then directly supervised Martinez and Torres, telling them where and when to go to the Raytheon site and how to install ceiling tiles. *See Mondragon v. Scott Farms, Inc.*, 5:17-cv-00356, 2019 WL 489117, at *8 (E.D.N.C. Feb. 7, 2019) (finding joint employment where one defendant directed the other on where to send workers and what work they needed to do).

Finally, HC exercised its power to effectively terminate workers by removing them from the Project. Once, HC removed a worker for "arguing and cursing" at its representatives. Another time, HC ordered a TSCG employee to go home after a safety infraction. HC, through its project superintendent, had and used unfettered authority to "make[] the call" to remove from the Project subcontractor employees like Plaintiffs temporarily or permanently. *See, e.g., Hall*, 846 F.3d at 772–73 (defendant's ceasing to permit plaintiffs to work amounted to "effective" termination, weighing in favor of joint employment).

***Degree of permanency and duration of relationship:*** During the single year in which TSCG existed, it had two subcontracts with HC: the Gold's Gym and Raytheon projects. TSCG worked on the Gold's Gym Project for approximately six months—half its corporate life—and that Project generated more revenue than any other it ever worked on. While working on the Project, TSCG only had one other small non-HC subcontract; virtually all its income came from HC. *See Young*, 2018 WL 279996, at *7 (most of one corporate defendant's business came from the other corporate defendant, weighing in favor of a finding that defendants were joint employers). Moreover, TSCG remained on the Project from the fall of 2017 through February 2018—the full "duration of the . . . construction project or a substantial part thereof." *Martinez v. Mendoza*, No. 5:17-cv-628-FL,

2018 WL 3762983, at *5 (E.D.N.C. Aug. 18, 2018) (duration-of-relationship factor supported joint employment where subcontractor remained on project for most of the period of construction).

***Control of premises where work was performed:*** HC controlled access to the premises where Plaintiffs performed the work at issue. Cole unlocked the site each morning and locked it each afternoon. TSCG did not have a key and Plaintiffs could only be there with HC's permission. *See Salinas,* 848 F.3d at 147 (plaintiffs performed work on construction site "controlled by" general contractor); *Lima*, 2019 WL 2602142, at *22 (same).

***Shared responsibility over functions ordinarily carried out by an employer:*** HC shared responsibility for "functions ordinarily carried out by an employer." *Salinas*, 848 F.3d at 141–42. It directly paid for "materials necessary [for Plaintiffs] to complete the[ir] work" via biweekly joint check to TSCG's supplier and by purchasing doors and frames through its own supplier. HC also provided equipment—a forklift— that Plaintiffs used for their work. *Id*.; *see also Lima*, 2019 WL 2602142, at *22 (general contractor was a joint employer where it "ma[de] available for all subcontractors certain equipment and materials, such as . . . a forklift").

At the same time, HC effectively covered TSCG's payroll by issuing payments every two weeks specifically to cover the subcontractor's labor costs. In *Bonnette v. Cal. Health & Welfare Agency*, the court concluded that government agencies jointly employed "chore workers" when they paid third parties "with the understanding that the wages would be paid over to the chore worker[s]." 704 F.2d 1465, 1470 (9th Cir. 1983). HC's practice was comparable—it paid TSCG for its labor biweekly "with the understanding that the wages would be paid over" to the employees.[5] Moreover, HC had the right under the Subcontract to pay TSCG's workers' wages

---

[5] In *Salinas*, the Fourth Circuit adopted a standard for joint employment that is broader than that in *Bonnette*. 848 F.3d at 137 ("We agree that *Bonnette*'s reliance on common-law agency principles does not square with Congress's intent that the FLSA's definition of 'employee'

directly, eliminating the need for the subcontractor as middleman altogether. *See Lemus*, 2011 WL 7069078, at *19 (finding that general contractor that "reserved the right to pay [subcontractor's] workers wages directly" jointly employed subcontractor's direct hires). Payroll is a function "ordinarily carried out by an employer" and HC's indirect and direct involvement in TSCG's payroll supports its joint employer status. *Salinas*, 848 F.3d at142.

HC also maintained records related to Plaintiffs' employment. Each day, it required Plaintiffs to report their attendance, by name and identifying number, on JSAs, and it required Garcia to detail Plaintiffs' manpower and tasks completed. *See Salinas*, 848 F.3d at 146 (general contractor was subcontractor employees' joint employer where it required them "to sign in and out with [general contractor] foremen"); *Lemus*, 2011 WL 7069078, at *15 (finding joint employment where contractor "track[ed] [subcontractor's] manpower on a daily basis"). In addition, HC had a right under the Subcontract to "review[] and audit[]" Plaintiffs' wage records, another traditional employer function. *Hall*, 846 F.3d at 773.

Of note, under *Salinas*, whether a putative employer provides workers with housing, clothing, meals, transportation, or job applications is not dispositive of joint employment. Although some of those facts were present in *Salinas*, the *Salinas* standard does not depend on any of them. Indeed, the same day it issued *Salinas*, the Fourth Circuit determined that the plaintiffs in *Hall v. DirectTV* had adequately pled joint employment notwithstanding that their complaint had not alleged that the putative joint employer gave them housing, meals, transportation, or job applications. *Id.* at 779. Any attempt to cabin the *Salinas* standard to the facts of that case is "narrowly formalistic"

---

encompass a broader swath of workers than would constitute employees at common law"). Accordingly, facts sufficient to establish joint employment under *Bonnette* necessarily establish joint employment under the less stringent standard in *Salinas*. *Id.* at 136 ("[S]atisfaction of the *Bonnette* factors . . . is not necessary to establish an employment relationship" but "can be sufficient to establish employer status.").

and inconsistent with the purposes of the FLSA. *McCoy*, 2022 WL 951996, at *9.

Further, whether HC's conduct reflects standard industry practice is irrelevant to the *Salinas* analysis. 848 F.3d at 141–42 (omitting "industry standard" from the six-factor joint employment analysis). Many of the practices HC engaged in—even assuming they are "standard" in construction—are the very same practices that courts have treated as indicia of joint employer status. *E.g.*, *id.* at 146, 148 (general contractor's "daily oversight of [p]laintiffs' work," "provi[sion] [of] regular feedback and instruction, through [subcontractor] supervisors," practice of "having [its] foremen walk the jobsite and check [subcontractor employee] [p]laintiffs' progress" and requirement that subcontractor employees attend weekly safety meetings all supported general contractor's joint employer status). At the same time, some of HC's practices on the Project were *not* standard in the industry and gave HC greater control over Plaintiffs. For example, the Subcontract authorized HC to approve TSCG employees for work on the Project, require the "discharge" of TSCG employees, supplement TSCG's workforce, review TSCG's payroll records, and directly pay TSCG's employees—all terms that do not appear in the model subcontract published by the AIA, which Voce testified establishes industry standards.[6] And, the central terms of the Subcontract relating to payment represented a unique departure even from HC's own norms: HC had never before made direct payments to a subcontractor's materials supplier *or* made biweekly payments to a subcontractor specifically for labor. Yet, it did so here to secure a discount on the Subcontract price. In short, industry standard has no bearing on the joint employment analysis under *Salinas*, and even if it did, such a consideration would not defeat

---

[6] To the extent that Voce also testified that many general contractors use their own subcontract templates, his testimony indicates that there is no industry standard with respect to construction subcontracts, undermining any claim that the Subcontract reflected such a standard.

joint employment in this case.[7]

## C.  Plaintiffs Have Established the Amounts of Their Earned but Unpaid Wages.[8]

Under the FLSA and Maryland wage laws, employers must compensate employees for all hours worked at a rate not less than the minimum wage. 29 U.S.C. § 206; Md. Code Ann., Lab. & Empl. § 3-413. Employers must also pay employees "a rate not less than one and one-half times the regular rate at which [they are] employed" for all hours over 40 per week. 29 U.S.C. § 207(a)(1); Md. Code Ann., Lab. & Empl. § 3-415. Violations of the minimum and overtime wage requirements of the FLSA and MWHL are *per se* violations of the MWPCL, which requires timely payment of "*all* compensation that is due *to an employee* for employment." *Marshall v. Safeway, Inc.*, 88 A.3d 735, 745 (Md. 2014) (citing Md. Code Ann., Lab. & Empl. § 3-501(c)(1)). A plaintiff must establish "that he has in fact performed work for which he was improperly compensated" and "produc[e] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). This is because the FLSA obligates the employer, not the employee, to maintain time and pay records. 29 C.F.R. § 516.2. If a plaintiff seeks to recover unpaid overtime wages, he must also show that the employer had "actual or constructive" knowledge of the overtime work. *Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 803 (D. Md. 2014).

Here, there is no dispute that Plaintiffs were not paid at all for several weeks of regular and overtime work. Plaintiffs have demonstrated their dates and hours of work through their testimony,

---

[7] Indeed, effective October 1, 2018, a general contractor is *per se* jointly and severally liable for its subcontractors' failure to pay employees in accordance with Maryland wage laws. *See* Md. Code Ann., Lab. & Empl. § 3-507.2(c)(2). While not in effect during the period relevant here, such law makes clear that finding joint employment here would not be radical or contrary to "industry standard," but rather entirely consistent with current Maryland law and standards.

[8] Plaintiffs do not seek separate relief for their common law claims for promissory estoppel and quantum meruit, which are derivative of their FLSA, MWHL, and MWPCL claims.

timesheets, and copies of (non-negotiable) paychecks issued by TSCG. Defendants did not present any evidence that meaningfully undermined Plaintiffs' dates and hours of work or promised pay rates. On the contrary, HC's own JSAs, daily logs, and emails corroborate Plaintiffs' account of their hours worked, and HC's lookahead schedules, daily logs, emails, and management testimony corroborate several Plaintiffs' testimony that they sometimes worked extra hours or on weekends. Moreover, Defendants had actual or constructive knowledge of Plaintiffs' overtime because HC directed Plaintiffs to work the overtime and Marceron approved Plaintiffs' weekly time. Plaintiffs have thus demonstrated they were denied minimum and overtime wages in violation of the FLSA and MWHL and "all compensation" due under the MWPCL, as well as the amounts of each Plaintiff's total unpaid wages. They are owed the amounts set forth in Paragraph 39, *supra*.

### D.  Plaintiffs Are Entitled to Enhanced Damages for Defendants' Violations.

Treble damages under the MWPCL are "remedial": they address the "practical difficulties that employees ha[ve] in bringing lawsuits to recover wages owed" and "provide[] a greater incentive for employers to pay employees the amounts owed them, in full." *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 630 (Md. 2014). They are available where an employer's failure to pay wages is not the result of a bona fide dispute, *i.e.* "a legitimate dispute over the validity of the claim or the amount that is owing." *Admiral Mortg., Inc., v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000); Md. Code. Ann., Lab. & Empl. 3-507.2(b). Plaintiffs need not prove that nonpayment was due to fraud or malicious intent to be eligible for treble damages. *See Admiral Mortg.*, 745 A.2d at 1031. Nor are treble damages available only where plaintiffs have proven consequential damages, notwithstanding certain decisions within this District which have sought to impose such a limitation. *See, e.g.*, *Guzman v. Mahjoub*, 17-cv-1591, 2019 WL 2233351, at *4 (D. Md. May 23, 2019). *Peters*—the seminal case setting governing treble damages under the MWPCL— makes clear that the absence of a bona fide dispute is the sole determinant of eligibility for such an

enhanced award. 97 A.3d at 629–30. To demonstrate the existence of a bona fide dispute and avoid treble damages, a defendant must show that it had an "actual, subjective belief" that it had no obligation to pay and that this position was "objectively and reasonably justified." *Id.* at 627.

Here, Defendants failed to prove that they actually and reasonably believed that they had no obligation to pay Plaintiffs. Marceron and HC both knew that Plaintiffs had not been paid for several weeks of work, and neither Defendant ever claimed that Plaintiffs were not legally entitled to their wages. On the contrary, at Marceron's direction, Haislipp sent an email on behalf of TSCG to LaFonte attaching written demands for payment for each Plaintiff, and HC did not challenge the veracity of the claims. Yet, HC took no action to ensure that Plaintiffs received their wages prior to this litigation, even though HC had a right under the Subcontract to review TSCG's payroll records and pay TSCG's direct employees, and even though Voce had assured Plaintiffs that payment was forthcoming. HC thus was both actually and constructively aware that Plaintiffs were working without pay, but permitted—and even encouraged—them to continue. *See Hausfield v. Love Funding Corp.*, 131 F. Supp. 3d 443, 466 (D. Md. 2015) (fact that defendant "acknowledged" plaintiff had earned and not been paid wages weighed against finding of bona fide dispute).

HC's unequal treatment of Plaintiffs and TSCG's second-tier subcontractors further belies any claim of bona fide dispute. Neither Plaintiffs nor the second-tier subcontractors had contracts with HC, but both installed drywall on the Project and both alerted HC that they had not been paid. HC viewed the two groups as functionally equivalent, but it chose to directly pay certain second-tier subcontractors while declining to even "entertain" the possibility of paying Plaintiffs. *See Admiral Mortg.*, 745 A.2d at 1031 (defendant's decision to pay one worker but not another similarly-situated worker suggested the absence of a bona fide dispute). HC admitted that the reason for the difference was that the second-tier subcontractors had secured counsel, were about to lien the Gold's Gym property, and thus could subject HC to legal or business consequences—not because

24

HC found Plaintiffs' claims lacking based on a "good faith analysis."[9] *See Hausfeld*, 131 F.Supp. 3d at 466 (evidence that defendant did not pay plaintiff for financial and other reasons, rather than a "good faith analysis" of plaintiff's entitlement to wages, undermined claim of bona fide dispute).

Even if the Court declines to grant treble damages, or any amount up to that limit, Plaintiffs are nonetheless entitled to liquidated damages equal to the amount of their unpaid wages. *See* 29 U.S.C. § 216(b). Such damages are the "norm" and "mandatory" in cases of FLSA and MWHL violations. *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997); *De Paredes v. Zen Nails Studio LLC*, TDC-20-2432, 2023 WL 2207405, at *5 (D. Md. Feb. 24, 2023). An employer can avoid liquidated damages only by showing that its act or omission giving rise to the violation was in good faith and that it had reasonable grounds for believing that such act or omission was lawful. *Mayhew*, 125 F.3d at 220. Such a showing requires proof that the employer "reli[ed] on legal advice or the equivalent." *De Paredes*, 2023 WL 2207405 at *5 (citing *McFeeley v. Jackson Street Entm't, LLC*, 825 F.3d 235, 245 (4th Cir. 2016)). For the same reasons set forth above, and because Defendants presented no evidence that they relied on legal advice to conclude that they were not obligated to pay Plaintiffs, Defendants' "mere assumption" that they had no such duty does not shield them from a liquidated damages award. *Id.*

### E.  Jacinto Garcia Was Not Plaintiffs' Employer.

Garcia was not his co-Plaintiffs' employer under *Rivera*, 2018 WL 2020423, at *9, and *Qun Lin*, 239 A.3d at 735–36, given the facts at I.E *supra*.

---

[9] To the extent HC believed it only had a duty to protect the Gold's Gym owner from liens, that belief does not create a bona fide dispute. HC knew that the Gold's Gym property could be subject to a mechanic's lien by a subcontractor for any unpaid work. Had it made even a cursory inquiry into the mechanic's lien statute, it would have understood that "subcontractor" includes any "person who has a contract with anyone except the owner or his agent" who is "doing work or furnishing materials or both for or about a building," a category which includes Plaintiffs. Md. Code Ann., Real Prop. §§ 9-101(g), 9-104(a)(1).

Dated: July 3, 2023                     Respectfully submitted,


                                        _____/s/_____
                                        Monisha Cherayil
                                        Lucy Zhou
                                        Debra Gardner
                                        PUBLIC JUSTICE CENTER
                                        201 North Charles Street, Suite 1200
                                        Baltimore, MD 21201
                                        (410) 625-9409 (Phone)
                                        (410) 625-9423 (Fax)
                                        cherayilm@publicjustice.org
                                        zhoul@publicjustice.org
                                        gardnerd@publicjustice.org


**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 3rd day of July 2023, I caused a true and correct copy

of the foregoing to be served via the Court's ECF system on all parties through their counsel of

record. In addition, I have mailed a copy to the following:

Frank Marceron
1740 Shadyside Road
Edgewater, MD, 21037

The Subcontractors Gateway, Inc.
c/o Frank Marceron
1740 Shadyside Road
Edgewater, MD, 21037

TSCG Drywall & Painting, LLC
c/o Frank Marceron
1740 Shadyside Road
Edgewater, MD, 21037


                                        _____/s/_____
                                        Lucy Zhou