# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | | |
|---|---|---|
| ANGELLA AGUILAR, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. GLS-18-03953 |
| | * | |
| DAVID E. HARVEY BUILDERS, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | ****** | |

## MEMORANDUM OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Memorandum Opinion contains the Court's findings of fact and conclusions of law related to the bench trial conducted in this case.

## BACKGROUND

On December 21, 2018 Plaintiffs Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, Jose Antonio Torres ("Plaintiffs") filed suit against: Defendant David E. Harvey Builders, Inc., d/b/a "Harvey-Cleary Builders" ("Defendant Harvey-Cleary" or "Harvey-Cleary"); Defendant Frank Marceron ("Defendant Marceron" or "Mr. Marceron"); The Subcontractors Gateway, Inc. ("TSCG") and TSCG Drywall and Painting, LLC (collectively "Defendant TSCG"); and Darlene Marceron, alleging violations of: the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; the Maryland Wage and Hour Law ("MWHL"), Md. Code. Ann., Labor & Empl. §§ 3-401 *et seq.*; the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 *et seq.*; and for promissory estoppel

and quantum meruit. (ECF No. 1).[1]

Prior to trial, Darlene Marceron was dismissed from this case, and default judgment was entered against Defendant TSCG for violations of the FLSA, MWHL, and MCPCL.[2]

By the time of the bench trial, Plaintiffs maintained the following causes of action against Defendant Frank Marceron and Defendant Harvey-Cleary, to wit, violations of: the FLSA, failure to pay minimum and overtime wages (Count I); the MWHL, failure to pay minimum and overtime wages (Count II); and the MWPCL, failure to pay all wages on their regular paydays and for all work performed before they were terminated. (Count III). *See* ECF Nos. 1, 112, and 135.[3] Also by the time of trial, Defendant Harvey-Cleary continued to assert that it was not a joint employer of any of the eleven Plaintiffs. Alternatively, if found liable, Defendant Harvey-Cleary persisted in its indemnification crossclaim against TSCG. (ECF Nos. 20, 135).[4] Furthermore, by the time of trial, Defendant Marceron continued to maintain that he was not the employer of the eleven Plaintiffs. Relatedly, he persisted in his counterclaim against Plaintiff Jacinto Garcia Romero, specifically a declaratory judgment that Plaintiff Romero was also an employer as defined under the FLSA, which would both make him a Defendant in the instant action and operate to bar his FLSA, MWHL and MWPCL claims against Defendant Marceron. (ECF Nos. 44. 143).[5] Finally, Defendant Marceron also maintained an amended crossclaim against Defendant Harvey-Cleary for indemnification and/or contribution. (ECF Nos. 44, 143).

---

[1] The prior procedural history of this case is outlined in sufficient detail both in the memorandum opinion issued by the predecessor judge assigned to this case, and in this Court's final pretrial order. *See* ECF Nos. 112, 143. Accordingly, herein, the Court only briefly recites the pertinent procedural history.

[2] *See* ECF Nos. 90, 97-99, 112-113. This Court views the default and default judgment decisions entered by the predecessor judge as law of the case. *See generally Musacchio v. United States*, 577 U.S. 237, 244-45 (2016). This Opinion resolves issues related to TSCG and damages that it owes.

[3] The prior judge assigned to the case dismissed the quantum meruit and promissory estoppel causes of action, and Plaintiffs do not separately seek such recovery. (ECF Nos. 112, 163 n.8).

[4] By the time of trial, default and default judgment against TSCG related to Defendant Harvey-Cleary's breach of contract crossclaim against TSCG had also been entered. (ECF Nos. 103, 112, 113).

[5] *See* also n.3, *supra*.

The Court presided over a five-day bench trial from May 22, 2023-May 26, 2023.  (ECF Nos. 146-151, 158-162).  The Court heard the evidence adduced by Plaintiffs and the Defendants, and has reviewed all of the trial exhibits.  (ECF Nos. 153-155, 157-162).

The Court ordered post-trial briefing by the parties, which was filed in July 2023.  (ECF Nos. 163-166).  The Court has analyzed the parties' post-trial briefing.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court now provides its findings of fact and conclusions of law.  In doing so, and to comply with the Rule, the Court "need only make brief, definite, pertinent findings and conclusions upon the contested matters, as there is no need for overelaboration of detail or particularization of facts."  *Wooten v. Lightburn*, 579 F. Supp. 2d 769, 772 (W.D. Va. 2008).  Rule 52(a) does not require the Court to make findings on all facts presented, nor is the Court required to make detailed evidentiary findings.  Rather, if the findings are sufficient to support the ultimate conclusion of the court, then they are sufficient.  *Darter v. Greenville Comm. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).[6]

In issuing its decision, this Court, sitting as a trier of fact at a bench trial, "has the duty to weigh [all] evidence," determine the credibility of witnesses, and "draw reasonable inferences and deductions from that evidence." *See generally United States v. Bales,* 813 F.2d 1289, 1293 (4th Cir.1987); *see also* 2 C. Wright, *Federal Practice and Procedure* § 374, at 315 (1982).

Upon consideration of all of the evidence in the record, namely: the Plaintiffs' and Defendants' exhibits admitted at trial; the testimony of the witnesses; the inferences to be drawn from all of the evidence; as well as the parties' post-trial briefing, the Court makes the findings of fact and conclusions of law contained herein.

---

[6] Put another way, the Court is not required to specifically identify every piece of evidence that supports its factual findings and conclusion of law. *See Wooten* and *Garter*, *supra*. Thus, the Court declined to do so in this memorandum opinion.

I.      **FINDINGS OF FACT**

   **A.  STIPULATED FACTS**

The parties stipulated to the following facts:

   1.  Harvey-Cleary was the general contractor for the construction of a Gold's Gym
       fitness facility in Riverdale, MD ("Gold's Gym Project") during all period relevant
       to the Plaintiff's claims.

   2.  Harvey-Cleary and TSCG entered into a subcontract ("the subcontract") under
       which TSCG was to perform certain drywall installation and acoustic work on the
       Gold's Gym Project (also "the Project").

   3.  Frank Marceron was the sole owner of TSCG during the relevant period.

   4.  Each of the Plaintiffs generally worked from 5:00 am to 1:30 pm each workday,
       with a half-hour lunchbreak, as did other laborers on the Project site.

   5.  Harvey-Cleary provided each of the Plaintiffs with a sticker that had a unique
       identifying number, which each Plaintiff was required to wear on his/her hard hat.

   6.  Each of the Plaintiffs was expected to sign his/her name and hard hat number on a
       Harvey-Cleary Job Safety Analysis form each day.

(Joint Exhibit 1; Plaintiffs' Exhibit 29).

   In the remaining factual sections, the Court makes findings of fact based on its review of
all of the exhibits introduced at trial, as well as based on the assessment of the trial witnesses'
demeanor and credibility.

   **B.  TSCG, FRANK MARCERON AND HARVEY-CLEARY**

   1.  *Frank Marceron and TSCG*

In 2017, Frank Marceron founded TSCG, which remained in business approximately one

year.  (Testimony of Frank Marceron, Trial Day 5).  TSCG hired all of the Plaintiffs, each of whom worked on the Gold's Gym Project.  The Plaintiffs' employment application forms had "TSCG" written on them and were maintained by TSCG, which Marceron knew.  (Testimony of Jacinto Garcia Romero, Day 1; Plaintiff's Exs. 4, 7; Harvey-Cleary Ex. 2; Marceron Ex. 19).

Defendant Marceron ultimately approved of all of the staff who worked for TSCG, and he was the one who established Plaintiffs' hourly wage rates and signed their paychecks, including for the Gold's Gym Project.  (Testimony of Jacinto Garcia Romero, Antonio Martinez, Jose Torres, and Fabricio Marroquin, Angella Aguilar, Trial Days 1-3; Plaintiffs' Exs. 26A-26K).  As sole owner, Mr. Marceron exercised operational control over all aspects of TSCG's business, and employed Bob Perrone to serve as a TSCG Project Manager, who aided in the supervision and management of Plaintiffs' work.  (Testimony of Jacinto Garcia Romero; Plaintiffs' Ex. 4; Plaintiffs' Ex. 21).  Although he did not visit the Gold's Gym jobsite, Defendant Marceron remained involved in a managerial capacity on the Project between in or about September 2017 until February 2018, including by communicating with Harvey-Cleary about the work performed by the Plaintiffs and about billing/payment issues.  (Harvey-Cleary Ex. 4, Marceron Ex. 27, Plaintiffs' Ex. 39; Testimony of Sarah Haislipp, Trial Day 4; Testimony of Joseph LaFonte, Trial Day 4).

Mr. Marceron also communicated with Sara Haislipp, TSCG's bookkeeper, about the timesheets submitted by Mr. Garcia Romero for the Plaintiffs, and he decided whether Plaintiffs were entitled to be paid for their work on the Project.  (Testimony of Sarah Haislipp, Trial Day 4).  Defendant Marceron also communicated with her about billing Harvey Cleary for worked performed—and labor and materials related to—the Gold's Gym project.  (Testimony of Sarah Haislipp, Trial Day 4; Marceron Ex. 22).

TSCG occasionally provided tools and ladders for the Plaintiffs to use on the Gold's Gym Project, which Mr. Marceron directed two employees to transport to the jobsite using his truck. (Testimony of Antonio Martinez and Jose Torres, Trial Days 2-3).

2. *Harvey-Cleary: Gold's Gym Project*

i. The Subcontract

The subcontract between TSCG and Harvey-Cleary for the Gold's Gym project was signed in October 2017. (Plaintiffs' Ex. 8). There were several key terms to the subcontract; the Court lists a few examples. First, TSCG was responsible for furnishing and paying for all "supervision, labor, materials, equipment. . .tools and supplies," and to perform the scope of work identified in the contract. (*Id.*, ¶¶ 3(a), 6(h)). Second, TSCG was responsible for "enforce[ing] strict discipline and good order among [its] employees," and was precluded from employing "any unfit person or anyone not stilled in the task assigned him." If any TSCG employee were, in Harvey-Cleary's opinion, "incompetent, unsuitable, or a hindrance to the progress of [the Project]," Harvey-Cleary had the discretion to require TSCG to dismiss that employee. (*Id.*, ¶3(e)). Third, if Harvey-Cleary requested copies of TSCG's "payroll journal, ledger, or other record showing the day of payment, amount paid, and number of hours paid for the days on which [work] was performed. . .the rate of wage per hour paid, and the identity of all payees," then TSCG was required to provide such information. (*Id.*, ¶3(g)). Fourth, TSCG was responsible for hiring, managing, and supervising its employee-workers, for "direct[ing] its own forces," and for ensuring that its work was at all times done "in compliance with federal, state and local laws." Harvey-Cleary retained the right to have TSCG "remove and/or remedy any work and/or worker it identifies to be in violation of the aforementioned codes and ordinances." (*Id.*, ¶10(a); Plaintiffs' Ex. 8, Exhibit C). Fifth, if TSCG failed to "furnish skilled workers. . .sufficient for the prompt and diligent prosecution of the

Subcontract Work in accordance with [Harvey-Cleary's] direction," Harvey-Cleary reserved the right to take over the work and charge TSCG for any costs incurred as a result. (*Id.*, ¶6(h); Testimony of Joseph LaFonte, Trial Day 4). Sixth, TSCG was required to comply with the work hours assigned by Harvey-Cleary's superintendent, and to complete all work on time using "adequate forces." (Plaintiffs' Ex. 8, ¶ 6(a), Exhibit C). Seventh, TSCG was required to pay its employees, subcontractors and suppliers, and to indemnify Harvey-Cleary should Harvey-Cleary incur any costs/expenses in the event that TSCG failed to live up to its obligations. (*Id.*, ¶¶ 3(h), 7; Testimony of Joseph LaFonte, Trial Day 4). Eighth, Harvey-Cleary retained discretion to decide whether to pay TSCG's "labor direct(sic) by paying each individual in person," and could exercise the option of paying-- directly or by joint check--TSCG's "sub-subcontractors, vendors or any other third party furnishing labor, materials, equipment..." (Plaintiffs' Ex. 8, ¶5(i)).

There were some atypical aspects to the subcontract and payment arrangement between TSCG and Harvey-Cleary. First, Harvey-Cleary agreed to biweekly payments to TSCG and to make joint check payments to TSCG's material supplier. (Joint Ex. 2, Deposition of Joseph LaFonte; Plaintiffs' Ex. 9). Harvey-Cleary agreed to these two terms in the subcontract in order to ensure that the work on the Project proceeded on schedule. (Joint Ex 2; Testimony of Joseph LaFonte, Trial Day 2). TSCG wanted biweekly payments, and in exchange it gave Harvey-Cleary a 5% discount on the contract price. (Testimony of Mark Voce, Trial Day 5; Testimony of Eddy Morales, Trial Day 5).

### ii.   Other TSCG Projects and TSCG Ownership

Frank Marceron testified that during TSCG's existence, only two of its projects (Raytheon and Gold's Gym) involved Harvey-Cleary. (Testimony of Frank Marceron, Day 5). There was no evidence that Harvey-Cleary had any form of ownership interest in TSCG.

iii.   <u>The Gold's Gym Project Workers</u>

Harvey-Cleary employed several subcontractors to perform work on the Gold's Gym Project, and many of those subcontractors employed their own laborers or had lower-tier subcontractors with laborers who worked on the Project.  (Testimony of Joseph LaFonte, Trial Day 4; Testimony of Mark Voce, Trial Day 5).

There was no evidence put before the Court that Harvey-Cleary hired or fired any of the Plaintiffs, nor was there any evidence that Harvey-Cleary provided housing, transportation, clothing, tools or meals to the Plaintiffs.  (Testimony of Joseph LaFonte, Trial Day 4; Testimony of Mark Voce, Trial Day 5; Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Plaintiffs' Ex. 29).  In addition, there was no evidence that Harvey Cleary set the amount of Plaintiffs' hourly wages, or that Harvey-Cleary maintained any kind of individualized employment records for the Plaintiffs, including applications, timecards/timesheets, and payroll documents.  (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Plaintiffs' Ex. 29).  Maintaining records of the hours worked by TSCG employees and their payrate was TSCG's responsibility, as set forth in the subcontract.  (Testimony of Joseph LaFonte, Trial Day 5; Plaintiffs' Ex. 8).

iv.   <u>The Jobsite</u>

Between in or about October 2017 and February 20, 2018, TSCG worked on the Gold's Gym Project.  (Testimony of Eddy Morales, Trial Day 5; Testimony of Jacinto Garcia Romero, Trial Day 1; Harvey-Cleary Ex. 9; Plaintiffs' Ex. 39; Plaintiffs' Ex. 20B).  Ultimately, the Gold's

Gym Project finished the latter part of February 2018.  (Testimony of Joseph LaFonte, Trial Day 4; Harvey-Cleary Ex. 9).

Some evidence was adduced at trial that Harvey-Cleary provided some of the supplies that some of the Plaintiffs used to do their work on the Gold's Gym Project, and that a Harvey-Cleary forklift was present on the jobsite.  (Testimony of Jacinto Garcia Romero, Trial Day 1; Joint Ex. 3, Deposition Testimony of Tim Cole; Testimony of Eddy Morales, Trial Day 5).

Access to the Gold's Gym Project worksite was controlled by Harvey-Cleary.  Specifically, every morning, Superintendent Tim Cole was usually the first person at the jobsite, and he unlocked the jobsite to permit access to all workers.  No one else had keys to the jobsite.  (Joint Ex. 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2).

When working onsite, all of the Plaintiffs generally worked from 5:00 am to 1:30 pm each day, with a half-hour break for lunch.  (Plaintiffs' Ex. 29; Testimony of Jacinto Garcia Romero, Trial Days 1-2).

While onsite, Plaintiffs were required to wear Harvey-Cleary-issued safety badges and stickers on their hardhats.  The badges were worn by some of the Plaintiffs on their clothing, and each of the stickers worn by Plaintiffs had a number that uniquely identified each of them.  (Joint Ex. 1; Plaintiffs' Exs. 10, 28, 29; Testimony of Joseph LaFonte, Day 4; Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3).[7]

Harvey-Cleary expected all Plaintiffs to attend Job Safety Analysis (JSA) meetings, and virtually all of the Plaintiffs testified to having attended such mandatory meetings.  (Testimony of

---

[7] Plaintiff Blanca Ferrer did not testify about this. *See* Testimony of Blanca Ferrer, Trial Day 3.

Angella Aguilar, Luis Baires, Carlos Chavarria, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3).  In addition, there were JSA forms and other safety forms that Plaintiffs were expected to sign every day; on these forms, Plaintiffs were expected to write their uniquely-assigned numbers each time that they signed.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Plaintiffs' Exs. 27, 29; Harvey-Cleary Ex. 2).  Some Plaintiffs testified that they signed these JSA Forms every day.  (*See, e.g.*, Testimony of Carlos Chavarria, Trial Day 2).  However, at trial, no party introduced JSA Forms for every day of the project.  (Harvey-Cleary Ex. 2).  The Court did not use the presence or absence of a JSA Form *by itself* as dispositive of the question of whether a Plaintiff worked on a given day.

Harvey-Cleary also maintained Daily Logs for the period of January 1, 2018 until February 28, 2018.  (Harvey-Cleary Ex. 9).

TSCG Foreman Jacinto Garcia Romero attended Harvey-Cleary's weekly meetings for subcontractors during which he provided updates on the progress of TSCG's work and heard from Harvey-Cleary about their expectations for the progress on the Project.  (Joint Exs. 2, 3; Plaintiffs' Ex. 27; Testimony of Jacinto Garcia Romero, Trial Days 1-2).  Harvey-Cleary required Jacinto Garcia Romero to complete a "Subcontractor's  Daily Report," in which he reported in writing the tasks performed by the TSCG employees.  (Plaintiffs' Ex. 17).  These reports also required him to make sure that all employees: had been oriented; attended the job site safety training; had been given personal protective equipment and had been oriented.  (*Id.*).

Harvey-Cleary Representative Tim Cole supervised Plaintiffs' work every day, providing instruction to them on the work to be completed each day to stay on schedule.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Testimony of Angella Aguilar, Carlos Chavarria, Trial Day 3).  According to Tim Cole, he "walked the [job]site all day long. . .looking. . .[to see] what's

being done; [to see] if these guys are working in the order that they said that they would," and to check for safety issues.  (Joint Ex. 3).  Harvey-Cleary had two-week "look ahead" schedules for the Gold's Gym Project, which it expected TSCG to follow and complete tasks by a certain time. (Plaintiffs' Ex. 11; Joint Exs. 2, 3).  When Harvey-Cleary was concerned about whether a sufficient number of TSCG personnel were onsite to complete TSCG's work per the Project's schedule, Harvey-Cleary spoke to TSCG about having a sufficient number of workers onsite to meet deadlines.  (Plaintiffs' Exs. 15, 35; Joint Ex. 3; Testimony of Mark Voce, Trial Day 5).

In addition, Mr. Cole's instructions given to Plaintiffs included: (a) giving a Plaintiff permission to do "hot work;" such authorization was required before subcontractors could safely perform this work; and (b) pointing out "sloppy work," telling Plaintiffs to move furniture, or directing Plaintiff(s) to "move a wall;" (c) instructing that work be redone if it failed to comply with Harvey-Cleary's expectations.  (Plaintiffs' Ex. 12; Testimony of Jacinto Garcia Romero, Trial Day 1; Joint Ex. 2; Testimony of Carlos Chavarria, Trial Day 2).

Mr. Cole also directly supervised and gave work-related instructions to some of the Plaintiffs, including to Antonio Martinez on a Saturday when Jacinto Garcia Romero was not there. (Testimony of Antonio Martinez, Trial Day 2).  If a worker did not speak English fluently, Mr. Cole's instructions would be communicated to Plaintiffs via TSCG Foreman Jacinto Garcia Romero or, on occasion, another Plaintiff would interpret Cole's instructions in English to another Plaintiff.  (Testimony of Jacinto Garcia Romero, Trial Days 1 - 2; Testimony of Angella Aguilar, Jose Torres, Fabricio Marroquin, Trial Day 3).  Tim Cole also provided direct feedback to some of the Plaintiffs if the quality of their work was good.  (Testimony of Antonio Martinez and Carlos Chavarria, Trial Day 2).

By the end of January 2018, Harvey-Cleary Representative Joseph LaFonte also expected Tim Cole to "push" subcontractors to work harder sooner rather than later on the project. Mr. LaFonte's view was that if "overtime" was required to complete the Project timely, then that is what the subcontractors "owed" Harvey-Cleary. (Plaintiffs' Ex. 24). Approval of overtime was done by TSCG, not Harvey-Cleary. (Testimony of Jacinto Garcia Romero, Trial Days 1-2).

Some Plaintiffs worked on Saturdays, a fact that Harvey-Cleary knew. (Harvey-Cleary Ex. 9, Bates Nos. 1341, 1408; Testimony of Jacinto Garcia Romero, Trial Days 1-2; Testimony of Carlos Chavarria, Trial Day 3; Plaintiffs' Ex. 20A).

It bears noting that Harvey-Cleary credibly established via the Plaintiffs' testimony, some of its trial exhibits, and the testimony of its witnesses that many of Harvey-Cleary's supervisory and oversight actions relative to Plaintiffs' work were typical aspects of a general contractor-subcontractor relationship. For example, Plaintiffs agreed that Tim Cole's action typified what a Superintendent does on a construction project involving a general contractor and its subcontractors. (Testimony of Luis Baires, Carlos Chavarria, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Trial Days 1-3). Those actions include "site walks," "checks" on the quality of the work performed, and efforts to ensure compliance with safety regulations. (Testimony of Luis Baires, Carlos Chavarria, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Trial Days 1-3). In addition, Joseph LaFonte and Mark Voce described Mr. Cole's actions as being consistent with what applicable regulations and the owner of the Gold's Gym required. (Testimony of Joseph LaFonte, Trial Day 4; Testimony of Mark Voce, Trial Day 5). Moreover, hard hat stickers and JSA meetings were pretty routine in the construction industry. (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Jacinto Garcia Romero, Antonio Martinez, Wilson Panozo, Jose Torres, Trial Days 1 - 3). Furthermore,

there was no evidence that Harvey-Cleary trained TSCG employees on the skills required to perform the work completed.  (Testimony of Angella Aguilar, Luis Baires, Fabricio Marroquin, Wilson Panozo, Jose Torres, Jacinto Garcia Romero, Trial Days 1-3; Testimony of Joseph LaFonte, Trial Day 4).

v.   Payments and Raytheon Project

At approximately the same time that the Gold's Gym Project was ongoing, specifically in or about January 2018, Harvey-Cleary was also involved in a construction project for Raytheon. (Testimony of Joseph LaFonte, Trial Day 4; Testimony of Jacinto Garcia Romero, Trial Day 1; Testimony of Antonio Martinez, Trial Day 2;  Testimony of Jose Torres, Trial Day 3; Testimony of Mark Voce, Trial Day 5; Plaintiffs' Ex. 21).  With the approval of TSCG, Harvey-Cleary directed Plaintiffs Antonio Martinez and Jose Torres to also work on the Raytheon project, which occurred on or about January 6, 2018 and January 9, 2018.  (Plaintiffs' Ex. 21).  Mark Voce, a former senior project manager for Harvey-Cleary, supervised them.  (Testimony of Antonio Martinez, Trial Day 2; Testimony of Jose Torres, Trial Day 3; Testimony of  Mark Voce, Trial Day 5).  Plaintiff Jacinto Garcia Romero was not there while they worked on the Raytheon project. (Testimony of Antonio Martinez, Trial Day 2; Testimony of Jose Torres, Trial Day 3).

Pursuant to the subcontract between TSCG and Harvey-Cleary, Harvey-Cleary was to pay TSCG approximately $293,000 for all of the work, which included the cost of labor and materials. (Plaintiffs' Ex. 8; Testimony of Joseph LaFonte, Trial Day 4).  TSCG regularly billed Harvey-Cleary for labor costs, and biweekly Harvey-Cleary issued two checks on behalf of TSCG, one to TSCG's material vendor and the other to TSCG.  Harvey-Cleary did not know what TSCG actually did with the second check; i.e., whether TSCG used it to pay labor.  (Testimony of Joseph LaFonte, Trial Day 4; Joint Ex. 2, Deposition of Joseph LaFonte; Plaintiffs' Ex. 9).

The date of the last TSCG invoice that was introduced during trial was for the week ending January 31, 2018.  (Harvey-Cleary Exs. 7, 8).  For the period of in or about late January 2018- February 2018, TSCG and Harvey-Cleary communicated about for labor performed on the Project related to "change orders."  (Marceron Ex. 22, 27).  In short,  evidence introduced at trial was related to work performed by TSCG employees in January 2018 and in February 2018.  (*See, e.g.*, Testimony of Joseph LaFonte, Trial Day 4, pp. 141-42; Harvey-Cleary Ex. 9; Plaintiffs' Ex. 39). The reasonable inference that the Court draws from all of the credible evidence put before it is that those TSCG employees were ten of the Plaintiffs.  (*See, e.g.*, Testimony of Joseph LaFonte, Trial Day 4, pp. 141-42; Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Plaintiffs' Ex. 20A-20D; 20F-20L).

In addition, towards the end of the Gold's Gym Project, TSCG subcontracted with second-tier subcontractors to have their employees aid TSCG's employees in completing the unfinished drywall and acoustic work on the Project.  (Testimony of Joseph LaFonte, Trial Day 4).  Because of this additional work, the amount paid to TSCG for the revised subcontract was approximately $338,000.  (Harvey-Cleary Ex. 8).  Harvey-Cleary paid additional amounts to TSCG's subcontractors.  Put another way, in or about February 2018, Harvey-Cleary had to supplement TSCG's work on the project.  (Plaintiffs' Ex. 11; Testimony of Joseph LaFonte, Trial Day 4). Harvey-Cleary "backcharged" TSCG for the costs associated with supplementation, which meant that, in the aggregate, approximately $413,000 was paid directly to TSCG or, for its benefit, to its subcontractors.  (*Id.*; Testimony of Joseph LaFonte, Trial Day 4).

As stated above, towards the end of the Gold's Gym Project, TSCG subcontracted with second-tier subcontractors to have their employees aid TSCG's employees in completing the

unfinished drywall and acoustic work.  From Harvey-Cleary's perspective, the work performed by TSCG employees and the second-tier subcontractor employees was the same.  (Testimony of Joseph LaFonte, Trial Day 4).

It is also worth noting that by no later than February 5, 2018, some of TSCG's second-tier subcontractors notified Harvey-Cleary that they had not been paid for work performed on the Project.  (Testimony of Joseph LaFonte, Trial Day 4; Harvey-Cleary Ex. 4; Testimony of Mark Voce, Trial Day 5).  Even though neither the TSCG employees nor the second-tier subcontractor employees were hired directly by Harvey-Cleary, Harvey-Cleary paid the second-tier subcontractors, yet it did not pay any of the Plaintiffs at that time.  (Testimony of Joseph LaFonte, Trial Day 4; Harvey-Cleary Ex. 4).  Despite the fact that Plaintiffs continued to work on the Gold's Gym project until at least February 19, 2018, because Plaintiffs were TSCG employees, Harvey-Cleary maintained its stance that it owed Plaintiffs "nothing."  (Testimony of Joseph LaFonte, Trial Day 4).

vi.   Leaving Jobsite, Payment Assurances and Other Future Work with TSCG

Sarah Haislipp testified that she was present during a meeting that occurred during the first part of January 2018 where Frank Marceron told Jacinto Garcia Romero to leave/walk off of the Gold's Gym Project worksite.  (Testimony of Sarah Haislipp, Trial Day 4).  Ms. Haislipp did not provide any more specific detail.  (*Id.*).[8]  In contrast, on redirect examination, Jacinto Garcia Romero testified that in or about the first part of January 2018, Mr. Marceron told him to tell the Plaintiffs to stop working on the part of the Project that related to change orders only, because Harvey-Cleary was not paying TSCG for the "change order" work.  (Testimony of Jacinto Garcia

---

[8] In addition, on cross-examination, Ms. Haislipp testified that, after that time (as late as January 28, 2018), she communicated with Mr. Garcia Romero via text when he sent her a summary timesheet. (Testimony of Sarah Haislipp, Trial Day 4).

Romero, Trial Day 1).   In other words, Mr. Marceron did not direct Plaintiffs to stop working on/to leave the entire Gold's Gym Project.  (*Id.*, Marceron Ex. 20).  On cross-examination, Mr. Garcia Romero testified that the "change order" work was related to damage done by other contractors and for the "hanging ceilings."  (Testimony of Jacinto Garcia Romero, Trial Day 2). According to Mr. Garcia Romero's trial testimony, then, Mr. Marceron did not tell Plaintiffs to stop working on the rest of the Gold's Gym Project, which related to hanging the doors and putting hardware in the bathrooms.  (Testimony of Jacinto Garcia Romero, Trial Day 2).

All of the Plaintiffs credibly testified that they worked for TSCG during January 2018-February 2018 but were not paid.  (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3).  Several Plaintiffs were shown TSCG paychecks dated January 31, 2018, but they were not given them to cash/deposit because TSCG had insufficient funds in its account.  (Plaintiffs' Exs. 26, 26A-26B; Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Fabricio Marroquin, Antonio Martinez, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 2-3; Marceron Ex. 20).

Clear credible evidence exists that Frank Marceron knew that Plaintiffs were working on the Project without being paid.  For instance, he told Angella Aguilar to keep working and she would get paid eventually.  (Testimony of Angella Aguilar, Trial Day 3).  Mr. Marceron told Antonio Martinez and Jacinto Garcia Romero that they would get paid when Harvey-Cleary paid him.  (Testimony of Antonio Martinez, Trial Day 2; Testimony of Jacinto Garcia Romero, Trial Day 1).

There was credible evidence adduced at trial that Harvey-Cleary knew that Plaintiffs were not being paid.  As early as February 5, 2018, and certainly by no later than February 18, 2018, TSCG made Harvey-Cleary aware of the fact that the TSCG employees had not been paid by TSCG for at least some of the work performed on the Project.  (Testimony of Joseph LaFonte, Trial Day 4; Harvey-Cleary Ex. 4; Testimony of Mark Voce, Trial Day 5; Joint Ex. 3).  Harvey-Cleary made clear to Mr. Marceron that it would not be responsible for TSCG's payroll because by early February 2018, Harvey-Cleary had already paid about $261,000 to TSCG related to the labor-related invoices submitted.  (Harvey-Cleary Exs. 4, 7, 8).  As the Court finds, *supra*, Harvey-Cleary knew that Plaintiffs were working on the Gold's Gym Project in February 2018. (*See, e.g.*, Harvey-Cleary Ex. 9).

There was credible testimony from several Plaintiffs that they notified either Tim Cole or Mark Voce that they had not been paid their wages, and either Mr. Cole or Mr. Voce led them to believe that they could and/or would ensure that they would get paid.  For instance, Mark Voce told Carlos Chavarria not to worry that he was going to see a way for them to get paid. Tim Cole told Carlos Chavarria not to worry and that he and the other workers would get paid, and that the "check was in Texas and had not been sent" due to inclement weather.  (Testimony of Carlos Chavarria, Trial Day 2).  In addition, Wilson Panozo testified that Mark Voce told him to continue working and "not to worry."  (Testimony of Carlos Chavarria, Trial Day 2).  Also, Antonio Martinez testified that he told Mark Voce that he was going to cease working because he was not getting paid, and Mr. Voce told him to continue working and he was going to try to rectify the situation.  (Testimony of Antonio Martinez, Trial Day 2). [9]

---

[9] Mr. Cole did not recall having such conversations with Plaintiffs. (Joint Ex. 2). Mark Voce first testified at trial that he "could have" had such conversations with TSCG's employees, but he could not fully recall them. He then testified that he thought he told some of the Plaintiffs that he would work with TSCG to resolve the non-payment issue. (Testimony of Mark Voce, Trial Day 5; Plaintiffs' Exs. 37-38).

The Court also considered the testimony of Jose Revelo, Jose Torres, Fabricio Marroquin, Blanca Ferrer, and Luis Bares in this regard.  (Testimony of  Jose Revelo, Jose Torres, Fabricio Marroquin, Blanca Ferrer, and Luis Bares, Trial Days 2-3).

Finally, there was testimony that some employees worked for TSCG after the Gold's Gym Project ended, and TSCG paid their wages due.  (*See, e.g.,* Testimony of Angella Aguilar, Antonio Martinez, Jacinto Garcia Romero and Jose Torres, Trial Days 1-3).

### C.  JACINTO GARCIA ROMERO

Plaintiff Garcia Romero was the foreman on the Gold's Gym Project.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Testimony of Fabricio Marroquin, Trial Day 3).  As the foreman, Mr. Garcia Romero attended JSA and weekly meetings conducted by Harvey-Cleary, and interacted with Tim Cole, receiving instructions from him about the work that Plaintiffs were to perform on the Gold's Gym Project and their progress related thereto.  All of this occurred while he was employed by TSCG and working on the Gold's Gym project.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Joint Exs. 1, 2; Plaintiffs' Ex. 39).  There was no credible evidence put before the Court that Mr. Garcia Romero ceased acting as an employee of TSCG during the life of the Project or that any of the other Plaintiffs ceased working for TSCG to work for Mr. Garcia Romero.  (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Plaintiffs' Exs. 20B-20L; Plaintiffs' Ex. 39).  Nor was there any credible evidence that Mr. Garcia Romero's work and the other Plaintiffs' work on the Gold's Gym Project was not performed on behalf of TSCG.  (*Id.*). Similarly, there was ample evidence that Mr. Marceron and TSCG knew that Plaintiffs continued to work for TSCG until on or about February 20, 2018.  (Testimony of Jacinto Garcia Romero,

Trial Days 1-2; Plaintiffs' Ex. 39; Marceron Ex. 20).

There was no evidence before the Court that Plaintiff Garcia Romero had the authority to hire or fire employees for TSCG, nor was there any evidence that he established their wage rates. There was no evidence before the Court that Mr. Garcia Romero had the authority to issue checks on behalf of TSCG for work on the Gold's Gym Project.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Testimony of Sara Haislipp, Trial Day 4; Plaintiffs' Exs. 26, 26A-26K).

### D.  EMPLOYEES' WAGE CLAIMS

#### 1. *Hourly Rates of Pay and Unpaid Wages*

Plaintiffs have credibly testified about their rates of pay.  Indeed, their hourly wage rates do not seem to be in dispute.  (Testimony of Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3). Thus, the Court finds that these were the Plaintiffs' hourly wage rates during the relevant period:

| NAME OF EMPLOYEE | HOURLY PAY RATE |
| --- | --- |
| Angella Aguilar | $22/hr |
| Luis Baires | $20/hr |
| Carlos Chavarria | $23/hr |
| Blanca Ferrer | $14/hr |
| Jacinto Garcia Romero | $30/hr |
| Fabricio Marroquin | $21/hr |
| Antonio Martinez | $25/hr |
| Wilson Panozo | $21/hr |
| Freddy V. Prado | $22/hr |
| Jose F. Revelo | $15/hr |
| Jose A. Torres | $25/hr |

Next,  the Court finds credible the Plaintiffs' testimony that they were not paid their regular wages or any overtime wages due.  (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo,

Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Plaintiffs' Exs. 26, 26A-26K).  Put another way, the Court finds that despite certain paychecks being mentioned to Plaintiffs, there is no credible evidence that sufficient funds existed to cover those "issued" checks.  (*Id.*).

In addition, the Court finds that several documents serve to directly corroborate the Plaintiffs' accounts of regular and overtime hours worked, including on Saturdays, or enable the Court to reasonably infer that Plaintiffs' accounts of their hours were accurate.  (*See, e.g.*, Plaintiffs' Exs. 11, 14-18, 21, 24, 27, 35, 36; Harvey-Cleary Ex. 9).  Furthermore, it is clear that Defendants Marceron and Harvey-Cleary knew that Plaintiffs worked overtime, e.g., on Saturdays, and Plaintiffs' hours were approved by Frank Marceron.  (Testimony of Antonio Martinez, Trial Day 2; Testimony of Sara Haislipp, Trial Day 4; Testimony of Jacinto Garcia Romero, Trial Days 1-2).  Finally, the Court finds credible the evidence developed at trial that Frank Marceron and Harvey-Cleary knew that Plaintiffs were not being paid.  (Testimony of Carlos Chavarria, Trial Day 2; Testimony of Antonio Martinez, Trial Day 2; Testimony of Mark Voce, Trial Day 5; Plaintiffs' Exs. 37-38; Testimony of Jose Revelo, Jose Torres, Fabricio Marroquin, Blanca Ferrer, and Luis Baires, Trial Days 2-3).

2. *Mechanic's Liens*

Plaintiffs Luis Baires and Wilson Panozo recovered some of the wages due to them on the Gold's Gym Project as part of a settlement of their mechanic's lien claims that they filed against entities who are not the Defendants in this case.  (Plaintiffs' Ex. 40; Testimony of Sally Dworak Fisher, Trial Day 5).

3.  *Timesheets*

Plaintiffs rely principally upon their timesheets and testimony to establish the amount of unpaid wages due.

The Court finds that number of hours worked by the Plaintiffs were largely documented on timesheets, which were completed by Jacinto Garcia Romero, on his own behalf and behalf of the other ten Plaintiffs.  (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Plaintiffs' Exs. 29, 20A-20L).  Jacinto Garcia Romero testified that he had first-hand knowledge of the accuracy of the hours based on his interactions with/working alongside Plaintiffs.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2).  In addition, Garcia Romero prepared summary timesheets of the hours worked.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Plaintiffs' Ex. 20A).

Most of the individuals' timesheets were signed or initialed by the Plaintiffs while on the jobsite.  (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Plaintiffs' Exs. 20B-20L).

Jacinto Garcia Romero provided summary timesheets for the Gold's Gym Project to Sara Haislipp, TSCG's bookkeeper, or sometimes he put the individual and summary timesheets in a folder and gave them to Bob Perrone or delivered them to TSCG's office.  (Testimony of Sara Haislipp, Trial Day 4; Testimony of Jacinto Garcia Romero, Trial Days 1-2).  Sara Haislipp recalls receiving summary timesheets only through the end of January 2018.  (Testimony of Sara Haislipp, Trial Day 4; Plaintiffs' Ex. 20A).  Ms. Haislipp did not recall whether she received summary timesheets from Mr. Garcia Romero for February 2018, although she did not affirmatively deny

that she received them.  (Testimony of Sara Haislipp, Trial Day 4).  Mr. Garcia Romero credibly testified that he provided February 2018 timesheets to TSCG.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2).  Relatedly, except as set forth below in the Damages Section,  the Court finds that Plaintiffs credibly testified that they worked on the Project in January 2018-February 2018.  (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3).  Next, Harvey-Cleary does not deny that there were some TSCG employees still performing drywall and other work on the Gold's Gym Project as late as February 19, 2018.  (Testimony of Joseph LaFonte, Trial Day 4; Harvey-Cleary Ex. 9).  Furthermore, there was evidence of at least Jacinto Garcia Romero working onsite on February 20, 2018 (Plaintiffs Ex. 39; Testimony of Jacinto Garcia Romero, Trial Days 1-2). Finally, Frank Marceron cannot credibly deny knowledge of TSCG employees working onsite in February 2018.  (*See, e.g.,* Plaintiffs' Ex. 39).

At trial, there were some questions raised about the integrity and accuracy of the timesheets.  For instance, Defendant Marceron tried to get Mr. Garcia Romero to admit that the timesheets upon which Plaintiffs were relying were fraudulent (had "white out" or  did not reflect the accurate address for TSCG).  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Marceron Exs. 12-15; 17-19).  In addition, during cross examination of Antonio Martinez, Defendant Harvey-Cleary explored how Jacinto Garcia Romero could have verified Mr. Martinez's hours because Mr. Martinez's timesheet reflected that he worked more hours that Mr. Romero reported being onsite.  (Testimony of Antonio Martinez, Trial Day 2; Plaintiffs' Ex. 20A).  Also, during cross examination of Carlos Chavarria, Defendant Harvey-Cleary explored how could Jacinto Garcia Romero could have verified Mr. Chavarria's hours because Mr. Romero's timesheet

reflected that he worked fewer hours than Mr. Chavarria did.  (Testimony of Carlos Chavarria, Trial Day 3).

These aforementioned allegations and some of the documentary evidence that the Court analyzed certainly did give it pause.  To make its findings, the Court analyzed the timesheets, testimony, and other documents adduced at trial.  For instance, on February 10, 2018 (Saturday), the Court sees that Plaintiffs' Ex. 20A does not reflect that any Plaintiffs worked, however, Harvey-Cleary Ex. 9 shows that 7 TSCG employees worked onsite  that day.  And, several Plaintiffs testified to working on Saturdays.  Also, Harvey-Cleary Ex. 9 shows that several TSCG employees worked on January 13, 2018 (Saturday), which is what Plaintiffs' Ex. 20A reflects.  Or, the Court notes that only a few of Plaintiffs' individual timesheets (signed) reflected hours worked for January 29-31, 2018.  (Plaintiffs' Exs. 20B, 20C, 20D, 20G, 20H, 20J, 20K).  Yet, the Court examined Plaintiffs' Ex. 20A, Harvey-Cleary Ex. 9, and the Plaintiffs' testimony, and found that credible evidence supported Plaintiffs' demand for wages.

Another example is that some Plaintiffs claim that they worked on February 20, 2018, but there was no individual timesheet for them: Angella Aguilar, Jose Torres, Jacinto Garcia Romero, Antonio Martinez and Wilson Panozo. (Plaintiffs' Ex. 20A; Testimony of Angella Aguilar, Jose Torres, Jacinto Garcia Romero, Antonio Martinez and Wilson Panozo, Trial Days 1-3; Plaintiffs' Exs. 20B, 20K, 20F, 20H, 20I)  However, the most logical inference that the Court drew from all of the credible evidence is that only Jacinto Garcia Romero worked on February 20, 2018. (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Plaintiffs' Ex. 20A; Plaintiffs' Ex. 39; Harvey-Cleary Ex. 9).

No single type of evidence was always dispositive on the issues of dates and hours worked. For instance, while it is certainly true that none of the timesheets or other documents reflect

Plaintiffs' arrival or departure times, the credible evidence was that Plaintiffs arrived onsite at 5:00 am and worked until 1:30 pm.  (Testimony of Jacinto Garcia Romero, Trial Days 1-2; Testimony of Freddy Verizaga Prado, Trial Day 3; Plaintiffs' Exs. 12, 29).  Next, sometimes, there were no JSA forms for TSCG employees for some of the days that the Daily Logs reflect that TSCG employees were working onsite.  (*Compare* Harvey-Cleary Ex. 2 with Harvey-Cleary Ex. 9, Bates Nos. 1341, 1394, 1408).  Moreover, some of Harvey-Cleary's Job Safety Analysis Forms  and Daily Logs contradict each other as to the number of TSCG workers onsite on a given day. (Testimony of Joseph LaFonte, Day 4; Harvey-Cleary Exs. 2, 9).  Thus, the Court did not view the presence or absence of a JSA form by itself as necessarily evidence of whether a Plaintiff worked or did not work on a given day.  Nor did the Court view the presence of an entry on the Daily Logs related to TSCG as dispositive on whether Plaintiffs performed work on a given day nor reflective of the number of TSCG workers onsite on a given day.

Lest the reader think otherwise, there were plenty of instances where the Plaintiffs more than met their burden in establishing dates hours that they worked.  For instance, for the period of February 12, 2018-February 17, 2018, when drywall work was done by the Plaintiffs, strong and corroborative evidence existed that the Plaintiffs worked the number of hours claimed. (*See* Plaintiffs' Ex. 11; Plaintiffs Exs. 20A, 20B, 20C, 20H, 20I, 20K; Harvey-Cleary Ex. 9; and Testimony of Angella Aguilar, Luis Baires, Antonio Martinez, Wilson Panozo, Jacinto Garcia Romero, Jose Torres, Trial Days 1-3).

In short, to the extent that the Court had questions about the accuracy of the timesheets, the point simply is that the Court exercised reasonable efforts to analyze all of the evidence (turned the Rubik's Cube©), and analyzed all of the timesheets and all of the testimony and exhibits related to the Plaintiffs' presence on the jobsite.  (*See, e.g.,* Plaintiffs' Exs. 20A-20L; Plaintiffs' Exs. 12,

14, 29, 39; Harvey-Cleary Exs. 2, 9).

Finally, despite the fact that Plaintiffs continued to work on the Gold's Gym Project in January 2018 and February 2018, no evidence was introduced at trial that TSCG made any wage-related payments to Plaintiffs for labor performed in January 2018 and/or in February 2018. (Testimony of Angella Aguilar, Luis Baires, Carlos Chavarria, Blanca Ferrer, Jacinto Garcia Romero, Fabricio Marroquin, Antonio Martinez, Wilson Panozo, Freddy Verizaga Prado, Jose Feliciano Revelo, and Jose Antonio Torres, Trial Days 1-3; Testimony of Joseph LaFonte, Trial Day 4; Marceron Exs. 6, 7).  The Court kept this fact in mind and was mindful of the Plaintiffs' burden of proof when it made findings in Section II, *infra*, about the damages proven.

## II.  CONCLUSIONS OF LAW

### A.  FLSA, MWHL AND MWPCL WAGES

#### 1.  *Minimum and Overtime Wages: FLSA and MWHL*

Pursuant to the FLSA, an employer is required to pay nonexempt employees at least the federal minimum wage for all hours worked.  *Turner v. Human Genome Science, Inc.,* 292 F.Supp.2d 738, 744 (D. Md. 2003); *see* 29 U.S.C. § 206(a)(1).  In addition, the FLSA requires an employer to pay an employee overtime for hours that the employee works that exceed 40 hours per week.  *Id.*; *see* 29 U.S.C. § 207(a)(1).  Moreover, overtime pay shall be "at a rate not less than one and one-half times the regular rate and which [the employee] is employed." 29 U.S.C. § 207(a)(1); Md. Code Ann., Lab. & Empl. §§ 3-415, 3-420.

To prevail on an FLSA claim for failure to pay minimum wage, Plaintiffs must establish that they "did not receive compensation equal to or exceeding the product of the total number of hours worked and the statutory minimum hourly rate during a given week." *Tall v. MV Transportation,* Civ. No. DKC 13-2306, 2014 WL 2964279, at *5 (D. Md. June 30, 2014); *see*

*also Blankenship v. Thurston Motor Lines, Inc.,* 415 F.2d 1193, 1198 (4th Cir. 1969).

To establish an FLSA claim for unpaid overtime wages, Plaintiffs must demonstrate: (1) that they were employed by the Defendant(s) during the relevant time; (2) that they worked overtime hours for which they were not properly compensated; and (3) Defendant(s) failed to pay overtime wages. *Jahn v. Tiffin Holdings, Inc.*, Civ No. SAG 18-1782, 20220 WL 1285507, at *3 (D. Md. Mar. 28, 2020).

Under the MWHL, employers are required to pay their employees a minimum hourly wage, and if an employee works more than 40 hours in a week, employees must be paid an overtime rate. Md. Code Ann., Lab. & Empl. §§ 3-413(b); 3-415(a) (2019).

In this District, "[c]laims under the FLSA and the MWHL can be analyzed together.  This is because [t]he requirements under the MWHL mirror those of the federal law.'" *Gaither v. Davi Transportation Services, LLC*, No. 18-cv-1447-ELH, 2020 WL 2614783, at *4 (D. Md. May 22, 2020) (quoting *Turner v. Human Genome Sciences, Inc.*, 292 F. Supp. 738, 744 (D. Md. 2003); citing *Friolo v. Frankel*, 373 Md. 501, 513 (2003)).  Thus, to prove an overtime claim under the MWHL and a failure to pay minimum wages claim, the requirements are the same as those under the FLSA.  *McFeely v. Jackson Street Entm't, LLC,* 47 F. Supp. 3d 260, 267 n.6 (D. Md. 2014)(MWHL is the FLSA's "state statutory equivalent"); *Gaither*, *supra*, 2020 WL 2614783, at *4; *see also Friolo v. Frankel*, 373 Md. 501, 513 (2003).

### 2. *Regular and Full Wages: MWPCL*

Under the MWPCL, an employer must pay its employees what they are owed "at least once in every two weeks or twice in each month."  Md. Code Ann., Lab. & Empl. § 3-502(a)(1)(ii).  In addition, the law requires an employer to pay its employees all wages due and owing in full upon their departure or termination.  Md. Code Ann., Lab. & Empl. § 3-505(a).

To prove the failure to pay all wages timely and regularly under the MWPCL, a plaintiff must establish that the employer failed to pay its employees regularly while they were employed and in full at the termination of their employment. *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 654 (2014); *see also Marshall v. Safeway*, 437 Md. 542, 561-62 (2014).

### B. EMPLOYER STATUS

As set forth earlier, default and default judgment were entered against Defendant TSCG, which necessarily means that Judge Xinis ruled that TSCG was Plaintiffs' employer under FLSA, MWHL, and MWPCL. (ECF No. 112). This ruling is law of the case. *See Musacchio v. United States*, 577 U.S. 237, 244-45 (2016)(if a court decides upon a rule of law, that decision should continue to government the same issues in subsequent states in the same case).

Defendant Marceron disputes that he was the employer of all eleven Plaintiffs. Relatedly, with respect to Plaintiff Jacinto Garcia Romero, Defendant Marceron seems to be asserting that Garcia Romero was their employer. Defendant Marceron also seems to allege that Defendant Harvey-Cleary is solely responsible for Plaintiffs' unpaid wages as their true employer, and alternatively seems to be contending that Defendant Harvey-Cleary was a joint employer of Plaintiffs. Defendant Harvey-Cleary avers that it did not jointly employ Plaintiffs. Thus, before answering the question of liability under the FLSA, MWHL, and the MWPCL, the Court must first analyze whether an employment relationship existed between the parties.

An employer is defined under the FLSA and Maryland law to "include[e] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §§ 203(d), (e); Md. Code Ann., Lab. & Empl. §§ 3-401(b), 3-501(b).

    1. *Individual Employer Liability*

An individual may be found liable as an employer if he has "managerial responsibilities and substantial control over the terms and conditions of the work of. . . employees."  *Kerr v. Marshall Univ. Bd. of Governors,* 824 F.2d 62, 83 (4th Cir. 2016); *Newell v. Runnels*, 407 Md. 578, 649-50 (2009).

To determine whether an individual is an employer covered under the FLSA, a court applies the "economic reality test," which consists of four non-dispositive factors, namely whether the individual: (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) decided the rate and method of payment; and (4) maintained employment records.  *Kerr*, *supra*, 824 F.3d at 83; *see also Gaske v. Crabcake Factory Seafood House, LLC*, Civ. No. 18-2530, 2021 WL 5326465, *2 (D. Md. Nov. 15, 2021)("economic reality test" applies to MWHL or the MWPCL).   In addition, because none of these factors is dispositive, "courts ultimately consider the totality of the circumstances in evaluating whether an individual qualifies as an employer under the economic realit[y] test." *Gaske*, 2021 WL 5326465 at *3 (citing *Kerr*, 824 F.3d at 83).

Previously, TSCG was found to be Plaintiffs employers under the FLSA, MWHL, and MWPCL.  (ECF No. 112).

Regarding Frank Marceron, the Court finds that he was Plaintiffs' employer under the operative statutes between in or about September 2017 until on or about February 20, 2018.  Mr. Marceron approved of the hiring of the Plaintiffs, and he had the power to hire and fire them.  Mr. Marceron decided the Plaintiffs' hourly wage and how frequently they would or would not be paid, and his company received and maintained Plaintiffs' employment records.  Mr. Marceron signed payroll checks. While it is true that Mr. Marceron did not visit the Gold's Gym Project jobsite

daily and did not have direct contact with ten of the Plaintiffs, the reasonable inference to be drawn from all of the evidence is that he delegated the supervision and control of the work of ten of the Plaintiffs to his foreman, Plaintiff Jacinto Garcia Romero, and to Bob Perrone, a TSCG Project Manager.  Mr. Marceron also communicated with Harvey-Cleary about payment for Plaintiffs' work. Furthermore, he communicated with Sara Haislipp about Plaintiffs' timesheets and about invoices submitted to Harvey-Cleary.

Evaluating the totality of the factual circumstances, the Court finds that the economic reality of the working relationship between Defendant Marceron and Plaintiffs is that he was their employer during the period at issue here. In sum, all of the *Kerr* factors weigh in favor of finding Mr. Marceron as an employer.  As set forth below in the Damages Section, Plaintiffs are entitled to minimum hourly wages for the hours worked and time-and-a-half for hours worked that exceeded 40 hours/week.

Regarding Jacinto Garcia Romero, the Court does not find that he was an employer under the FLSA, MWHL and MWPCL.  Plaintiff Garcia Romero did not have the ability to hire or fire the Plaintiffs, or to determine other conditions of their employment (e.g., to determine their hourly wage rate, and how/when they would be paid).  In addition, Mr. Garcia Romero only supervised their work via his role as TSCG foreman on the Gold's Gym Project.  Mr. Garcia Romero did prepare summary timesheets and individual timesheets for himself and Plaintiffs, and he was responsible for tallying the total number of hours worked by the Plaintiffs.  However, the other ten Plaintiffs testified that the timesheets reflected the hours that they worked, and that they indicated their assent to the hours by initialing or signing the documents.  Ultimately, the credible evidence is that the relevant timesheet records were submitted to TSCG.  Thus, the Court finds that, at minimum, TSCG and Mr. Marceron were clearly responsible for paying the wages due to all

Plaintiffs.

### 2. *Joint Employer Liability*

#### a. The Law

It is possible for more than one entity to jointly employ a worker. *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133, 139-40 (4th Cir. 2017). Joint employers "are responsible, both individually and jointly, for compliance [with the FLSA]." 29 C.F.R. § 791.2(a).

Two or more entities and/or individuals may be jointly liable employers if they are

> '*not completely disassociated*' with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine—*formally or informally*, *directly or indirectly*—the essential terms and conditions of workers.

*Salinas*, 843 F.3d at 141 (emphasis supplied); *see also* 29 C.F.R. § 791.2(a)).

In order to determine a person's or entity's joint employer status, this Court analyzes the following six non-exhaustive factors:

> (1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

> (2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms and conditions of the worker's employment;

> (3) The degree of permanency and duration of the relationship between the putative joint employers;

> (4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

> (5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

> (6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Salinas*, 848 F.3d. at 141-142.

The *Salinas* Court made clear that the aforementioned six elements:

> do not constitute an exhaustive list of all potentially relevant considerations. To the extent that facts not captured by these factors speak to the fundamental threshold question that must be resolved in every joint employment case –whether a purported joint employer shares or codetermines the essential terms and conditions of a worker's employment—courts must consider those facts as well.

*Id.* at 142. The Fourth Circuit has also made clear that the "ultimate determination of joint employment" must be based upon an analysis of "the circumstances of the whole activity." *Salinas*, 848 F.3d at 142 (quoting *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 306 (4th Cir. 2006)); *see also* 29 C.F.R. § 791.2(a) (in determining whether joint employment exists, primary focus is on whether to entities are "entirely independent" or "not completely disassociated" regarding a worker's employment).

Moreover, the *Salinas* Court made clear that:

> the joint employment inquiry is a highly factual analysis. Accordingly, while one factor supported by significant facts pointing to two or more entities' codetermination of the key terms and conditions of a worker's employment may be sufficient to establish that the entities are joint employers, another factor with weaker factual support may not be. For example, a general contractor that sets the start and end times for all work on a jobsite or establishes site-wide safety protocols may not be a joint employer *absent additional evidence* of the general contractor's codetermination of the essential terms and conditions of the workers' employment.

848 F.3d at 142 n.10.

Furthermore, the *Salinas* Court has held that applying the joint employment test to the so-called traditional general contractor-subcontractor relationship is perfectly appropriate, as it "simply ensures that 'the wages paid by private employers are sufficient to maintain the bare cost of living [for a worker].'"  848 F.3d at 144.  To be clear, the six-factor test applied under such a scenario is "highly factual," and "certain elements of the 'traditional' general contractor control over workers on a jobsite might not be enough *alone* to trigger a finding that the general contractor jointly employs every worker on the site."  848 F.3d at 144 n. 11 (emphasis supplied).

In sum, this Court does not read *Salinas* to require it to engage in a rigid totaling of a certain number of factors[10] to determine whether Harvey-Cleary was a joint employer.  *See also McCoy v. Transdev Servs., Inc.* Civ No. DKC 19-2137, 2022 WL 951996, at *9. (D. Md. Mar. 30, 2022)(absence of one *Salinas* factor not dispositive on "whether a joint employment relationship exists").  Rather, the Court followed the dictates of *Salinas* and its progeny and determined whether Harvey-Cleary was a joint employer by performing a "highly factual," totality of the circumstances analysis, focusing first on whether Harvey-Cleary was "entirely independent" or "not completely disassociated" from TSCG and Frank Marceron regarding Plaintiffs' employment, i.e., whether Harvey-Cleary shared or codetermined essential terms and conditions of Plaintiffs' employment.  Next, because this case involved a general contractor-subcontractor relationship, the Court followed *Salinas*, performed a "totality of the circumstances" analysis of the entire record, and did not make its finding solely on the presence of only one or two so-called "traditional" elements of a "typical" general contractor-subcontractor relationship.  By way of example, then, this Court did not find Tim's Cole's actions *by themselves* sufficient to establish that Harvey-Cleary was a joint

---

[10] The question of whether an entity is a joint employer involves analysis of the "totality-of-the-circumstances test" and is not like a baseball game, "[decided by] a score of 5 to 3." *Salinas*, 848 F.3d at 142 (citing Judge Easterbrook in *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403 (7th Cir. 2007).

employer.

        b.  <u>Application of the Law to the Totality of the Factual Circumstances</u>

          i.  *Salinas* Factor 1 - Joint Determination, Sharing, or Allocating of Power to Direct, Control or Supervise Plaintiffs, Including by Direct or Indirect Means

Upon review of all of the credible evidence and drawing reasonable inferences therefrom, the Court finds that Harvey-Cleary possessed and exercised its power to control and supervise Plaintiffs in several ways. Harvey-Cleary prepared the "look-ahead" schedules without input from TSCG, and Plaintiffs were expected to complete those tasks per the schedules. Superintendent Tim Cole was onsite daily, directly supervising and inspecting the quality of Plaintiffs work. If there was a problem with their work, e.g., the work was "sloppy," he would communicate those deficiencies through TSCG's foreman or to them directly, and the expectation was that the deficiencies had to be remedied. TSCG's work had to be acceptable to Harvey-Cleary. This type of one-on-one feedback and direction is strongly indicative of joint control over the workers. In addition, "hot work" could not be performed by any TSCG worker without Harvey-Cleary's authorization.

Moreover, attendance at Harvey-Cleary's JSA safety meetings was mandatory before Plaintiffs were permitted to perform certain tasks. During these meetings, instructions were given regarding safety and the projects to be completed that day. Also, the Plaintiffs were required to complete JSA forms and wear Harvey-Cleary stickers and safety badges while onsite; this requirement to comply with safety controls was not elective. Equally important, these stickers, with unique numbers specifically assigned to each Plaintiff, really did serve as a form of an identification document for Harvey-Cleary. The fact that the stickers contained a number, and not a Plaintiff's name, does not change the fact that they are a form of Harvey-Cleary generated identification unique to a specific person.

Next, while it is true that Harvey-Cleary did not maintain timesheets for Plaintiffs, the credible evidence at trial is that Harvey-Cleary regularly was concerned about-- and tracked-- Plaintiffs whereabouts on the jobsites.  Indeed, the reasonable inference that the Court draws is that having unique stickers for each Plaintiff and requiring them to sign JSA forms was designed, in part, to know where Plaintiffs were at all times.

Furthermore, Jacinto Garcia Romero was also required to attend subcontractors' meetings and advise his workers of the work that had to be performed per Harvey-Cleary's directions.

The fact that these types of contractual "oversight" actions are emblematic of a "typical" general contractor-subcontractor relationship does not preclude the Court from considering these actions *along with other facts* under a totality of the circumstances analysis.  *Salinas*, 848 F.3d at 142, n.10; 143-44 (emphasis supplied).

In sum, analysis of the first factor weighs in favor of the Plaintiffs.

> ii. *Salinas* Factor 2 - Joint Determination, Sharing, or Allocating of Power to Hire or Fire Plaintiffs or Modify the Terms and Conditions of Their Employment, including by Direct or Indirect Means

Upon review of all of the credible evidence and drawing reasonable inferences therefrom, the Court finds that Harvey-Cleary and TSCG/Frank Marceron were "not completely disassociated" with respect to the actual terms and conditions of Plaintiffs' employment.  It is certainly true that Harvey-Cleary did not have the power to hire or fire the Plaintiffs, as they worked for TSCG.  However, the Subcontract did preclude TSCG from employing "any unfit person or anyone not stilled in the task assigned him."

Even putting these facts to the side, which *Salinas* does not require the Court to do, other significant evidence exists establishing that Harvey-Cleary was not "entirely independent" regarding Plaintiffs' employment.  Indeed, the evidence establishes that Harvey-Cleary played a

role in certain key terms and conditions of Plaintiffs' employment.  For example, because Harvey-Cleary controlled access to the Gold's Gym worksite via Tim Cole and a key, Harvey-Cleary dictated the hours that Plaintiffs could actually work.  Next, per the Subcontract, TSCG was required to comply with the work hours assigned by Harvey-Cleary's superintendent, Tim Cole, and to complete all work on time using "adequate forces."  In addition, Harvey-Cleary directed Plaintiffs to work overtime (including on Saturdays) to get work done.  Furthermore, while the Gold's Gym Project was ongoing, Harvey-Cleary directed two of the Plaintiffs to also work overtime hours on the Raytheon Project.  Mark Voce directly supervised Messrs. Martinez and Torres as they did that work. This is strong evidence of Harvey-Cleary's direct control over the conditions of employment.

In sum, analysis of the second factor weighs in favor of the Plaintiffs.

### iii. *Salinas* Factor 3 - Degree of Permanency and Duration of the Relationship between Harvey-Cleary and TSCG/Frank Marceron

Upon review of all of the credible evidence and drawing reasonable inferences therefrom, the Court first finds that the relationship between Harvey-Cleary and TSCG/Frank Marceron was a relatively short one.  The relationship on the Gold's Gym Project lasted approximately five months, i.e., in or about late September 2017 until in or about February 20, 2018, and the Raytheon Project occurred during some of that time period.  While it is true that during that roughly five-month period TSCG directly or indirectly received approximately $338,000 from Harvey-Cleary, no clear, credible evidence was developed at trial about whether that figure represented the majority of TSCG's revenue.

In sum, analysis of the third factor does not weigh in Plaintiffs' favor.

### iv. *Salinas* Factor 4 - Direct or Indirect Ownership Interest

Upon review of all of the credible evidence and drawing reasonable inferences therefrom,

the Court does not find that Harvey-Cleary had a direct or indirect ownership interest in TSCG.

In sum, analysis of the fourth factor does not weigh in Plaintiffs' favor.

> v. *Salinas* Factor 5 - Work Performed on Premises Owned or Controlled by One of the Putative Joint Employers

Upon review of all of the credible evidence and drawing reasonable inferences therefrom, the Court finds that Harvey-Cleary, the general contractor on the Gold's Gym job, controlled Plaintiffs' access to the premises.  *See* Section II.B.2.b.i., *supra*.  *See Salinas,* 848 F.3d at 147. The fact that the Owner of the Gold's Gym decided the hours that the project could occur does not change the fact that the work could not begin until Tim Cole opened the jobsite or told the subcontractors when they could work onsite.

In sum, analysis of the fifth factor weighs in Plaintiffs' favor.

> vi. *Salinas* Factor 6 - Joint Determination, Sharing, or Allocating of Responsibility over Functions Ordinarily Carried Out By Employer, Including: Handling Payroll; Providing Workers' Compensation Insurance; Paying Payroll Taxes; or Providing Equipment, Tools, or Materials Necessary to Complete the Work

Upon review of all of the credible evidence and drawing reasonable inferences therefrom, the Court finds that, analysis of some facts under the sixth factor support a finding that Harvey-Cleary was a joint employer, while analysis of other facts, by themselves, do not support such an inference.

First, there was no evidence that Harvey-Cleary hired any of the Plaintiffs; thus Harvey-Cleary did not have Plaintiffs' timesheets, handle payroll, pay payroll taxes, or provide workers' compensation insurance for the Plaintiffs.  Relatedly, the fact that the Subcontract empowered Harvey-Cleary to request and receive copies of TSCG's "payroll journal," does not tip this fact in Plaintiffs favor because there was no evidence that Harvey-Cleary ever made such a request. Second, there was no evidence that Harvey-Cleary provided tools, meals, housing, transportation

or clothing to Plaintiffs.  However, on the same day that the Fourth Circuit issued its decision in *Salinas*, the Appellate Court also held that the absence of these facts does not necessarily preclude a finding of joint employer liability.  *Hall v. DirectTV*, 846 F.3d 757, 779 (4th Cir. 2017).

On the other side of the ledger, the Court first finds that evidence was adduced at trial that Harvey Cleary provided some of the supplies that some of the Plaintiffs used to do their work on the Gold's Gym Project, and that a Harvey-Cleary forklift was present on the jobsite.

Next, the Court evaluated the totality of the circumstances, and finds that most of the *Salinas* factors weigh in favor of finding that Harvey-Cleary was a joint employer.  In this regard, there is one more key fact that the Court analyzed. The evidence established that Harvey-Cleary expected TSCG to use one of the biweekly checks issued to TSCG to pay for its labor.  However, the Court also finds credible the evidence that Mark Voce and Tim Cole knew that Plaintiffs had not been paid, yet encouraged Plaintiffs to keep working on the Gold's Gym Project, and made assurances that they would get paid.  By so doing, Harvey-Cleary changed the nature of the relationship between it and the Plaintiffs, and helped to push Harvey-Cleary over the line into the realm of joint employer.  The evidence at trial was that Plaintiffs' work on the Gold's Gym Project was necessary to Harvey-Cleary's business operation, and integral to its ability to earn income and profit from this construction project.  The Court reasonably infers from the evidence that by telling Plaintiffs to keep working, yet not exercising its option under the Subcontract to pay Plaintiffs' wages directly, Harvey-Cleary profited or benefited off of the Plaintiffs' work, yet the Plaintiffs have received no wages for their work.  One of the key purposes of the FLSA is "to protect 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profits of others.'"  *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999)(quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No.123*, 321 U.S. 590, 597 (1944),

*superseded in part by statute*, 29 U.S.C. § 254(a)).  Put another way, one of the purposes of the FLSA is to ensure that a quintessential aspect of an employer-employee relationship occurred: an employer's payment of wages to its employees.  In sum, Harvey-Cleary's decision to not pay Plaintiffs yet profit off of their work is what aids this Court in finding that the sixth factor weighs in favor of Plaintiffs.

A final note.  At trial and during its post-trial briefing, Harvey-Cleary contends that it is not Plaintiffs' joint employer for several reasons, principal among them is its view that the relationship between TSCG and Harvey-Cleary was a "typical" general contractor-subcontractor relationship.  However, the Fourth Circuit makes clear that the existence of such relationship and its continued prevalence in society "has no bearing on whether the entities [at issue] codetermine the essential terms and conditions of a worker's employment and, therefore, constitute joint employers for purposes of the FLSA."  *Salinas*, 848 F.3d at 143-44.  This Court's findings are based on its highly-factual analysis of the specific facts present in this case.  The Court has followed the six-factor *Salinas* test, examining the totality of the facts present here, including those not necessarily captured by the *Salinas* factors*.  The Court has found evidence beyond that of the "typical" general contractor relationship, which it holds constitutes "additional evidence" of Harvey-Cleary's codetermination of a sufficient number of terms and conditions of the Plaintiffs' employment.  *See* 848 F.3d at 142.

The Court finds that Plaintiffs have met their burden on establishing a preponderance of facts to support a finding that TSCG and/or Frank Marceron were "not completely disassociated" with respect to Plaintiffs' employment.  Harvey-Cleary and Frank Marceron/TSCG did not act entirely independently of each other.  Harvey-Cleary played a substantial role in determining a sufficient number of the essential terms of Plaintiffs' employment.  Harvey-Cleary is not being

found liable as a joint employer solely based on acting as a "typical" general contractor in a "typical" construction project involving a general contractor and one of its subcontractors.  It is the combined influence of Harvey-Cleary and Mr. Marceron/TSCG over the essential terms and conditions of the Plaintiffs' activities that results in this Court finding that Harvey-Cleary was a joint employer.

### C.  DAMAGES

#### 1.  Burden of Proof

Plaintiffs allege that they were not paid wages for the work that they performed in January 2018-February 2018.  Plaintiffs have the burden of establishing that they have "performed work for which [they were] not properly compensated."  *Alston v. DIRECTV, Inc.*, 254 F. Supp. 3d 765, 787 (D.S.C. 2017)(quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), *superseded by statute on other grounds*, 29 U.S.C. §254(a)).

Damages may be awarded by a court based on a plaintiff's testimony "even though the amounts claimed are only approximated and not perfectly accurate."  *Lopez v. Lawns R. Us.*, Civ No. DKC 07-2979, 2008 WL 2227353, at *3 (D. Md. May 23, 2008); *see also Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988)(plaintiff need not "prove each hour of overtime work with unerring accuracy or certainty").

#### 2.  Unpaid Wages Owed

Having reviewed all of the evidence, the Court finds that the Plaintiffs have met their burden in establishing regular wages and overtime wages due and not properly paid, in violation of the FLSA, MWHL and MWPCL.  As articulated previously in this Memorandum Opinion, the Court reviewed all of the documents and testimony adduced at trial, observed the trial witnesses' demeanor while testifying about the hours worked/not worked, and determined which witnesses

were more credible.

In the charts below, the Court has made specific findings about the amounts and types of wages due and owing to Plaintiffs.   To compute regular wages due, the Court multiplied the hourly wage rates times the number of hours worked.   To compute the overtime hours due, the Court multiplied the number of overtime hours worked times the overtime hourly rate (time-and-a-half on the regular hourly rate).

In making damages findings, the Court finds that the Plaintiffs have credibly testified as to their hourly wage rates, hours of employment, and dates of employment while working on the Gold's Gym Project in January 2018 and/or February 2018, except as noted below in the charts. As mentioned previously, the Court finds that some of the Plaintiffs who testified at trial were impeached regarding the number of hours or days that they worked.   Put another way, the Court does find that there were some discrepancies between their testimony and what the records introduced at trial reflected as to hours or days worked.   While the Court explicitly does not find that Plaintiffs' timesheets were "Whited Out" or altered by Jacinto Garcia Romero, the Court did not just blindly accept the amounts set forth by the Plaintiffs.   After assessing the credibility of the witnesses' testimony and identifying corroborating documentary and testimonial trial evidence, the Court finds damages as outlined in the charts below.   Thus, some deductions were made.

Finally, these charts list *some* of the more persuasive forms of evidence upon which the Court relies to find that Plaintiffs' damages.

## ANGELLA (NELLY) AGUILAR

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($22/hr) | Evidence[11] |
|---|---|---|---|---|---|
| 1/28/18 | 32 | 32 | 0 | $704.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20B; Harvey-Cleary Exs. 2, 9; Testimony of Angella Aguilar, Trial Day 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 2/4/18 | 40 | 40 | 0 | $880.00 | |
| 2/11/18 | 32 | 32 | 0 | $704.00 | |
| 2/18/18 | 32 | 32 | 0 | $704.00 | |
| 2/25/18 | 0 | 0 | 0 | $0.00 | |
| | | | | | |
| TOTAL | | | | $2,992.00 | |

## LUIS BAIRES

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($20/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 44 | 40 | 4 | $920.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20C; Harvey- Cleary Exs. 2, 9; Testimony of Luis Baires, Trial Day 3; Testimony of Sally Dworak-Fisher, Trial Day 5; Plaintiffs' Ex. 40; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 40 | 40 | 0 | $800.00 | |
| 1/21/18 | 34 | 34 | 0 | $680.00 | |
| 1/28/18 | 38 | 38 | 0 | $760.00 | |
| 2/4/18 | 40 | 40 | 0 | $800.00 | |
| 2/11/18 | 32 | 32 | 0 | $640.00 | |
| 2/18/18 | 40 | 40 | 0 | $800.00 | |
| | | | | | |
| TOTAL | | | | $5,400.00 | |
| | | | | | |
| Mechanics Lien Offset | | | | $4,160.00 | |

---

[11] The last column, first row, of every chart refers to some of the exhibits that support the damages amounts claimed for all periods identified by each Plaintiff.

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($20/hr) | Evidence |
|---|---|---|---|---|---|
| | | | | | |
| **TOTAL FOR LUIS BAIRES** | | | | $1,240.00 | |

## CARLOS CHAVARRIA

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($23/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 44 | 40 | 4 | $1,058.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20D; Harvey- Cleary Exs. 2, 9; Testimony of Carlos Chavarria, Trial Day 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 40 | 40 | | $920.00 | |
| 1/21/18 | 40 | 40 | | $920.00 | |
| 1/28/18 | 32 | 32 | | $736.00 | |
| 2/4/18 | 40 | 40 | | $920.00 | |
| 2/11/18 | 32 | 32 | | $736.00 | |
| | | | | | |
| **TOTAL** | | | | $5,290.00 | |

## BLANCA FERRER

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($14/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 44 | 40 | 4 | $644.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20E; Harvey- Cleary Exs. 2, 9; Testimony of Blanca Ferrer, Trial Day 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 40 | 40 | 0 | $560.00 | |
| 1/21/18 | 32 | 32 | 0 | $448.00 | |
| 1/28/18 | 24 | 24 | 0 | $336.00 | |
| 2/4/18 | 16 | 16 | 0 | $224.00 | |
| | | | | | |

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($14/hr) | Evidence |
|---|---|---|---|---|---|
| TOTAL FOR BLANCA FERRER | | | | $2,212.00 | |

### JACINTO GARCIA ROMERO

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($30/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 44 | 40 | 4 | $1,380.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39; Plaintiffs' Exs. 20A, 20F; Harvey-Cleary Exs. 2, 9; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 40 | 40 | 9 | $1,605.00 | |
| 1/21/18 | 34 | 34 | 0 | $1,020.00 | |
| 1/28/18 | 36 | 36 | 0 | $1,080.00 | |
| 2/4/18 | 40 | 40 | 0 | $1,200.00 | |
| 2/11/18 | 40 | 40 | 0 | $1,200.00 | |
| 2/18/18 | 40 | 40 | 0 | $1,200.00 | |
| 2/25/18 | 16 | 16 | 0 | $480.00 | |
| | | | | | |
| TOTAL | | | | $9,165.00 | |

### FABRICIO MARROQUIN

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($21/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 44 | 40 | 4 | $966.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39; Plaintiffs' Exs. 20A, 20G; Harvey- Cleary Exs. 2, 9; Testimony of Fabricio Marroquin, Trial Day 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 40 | 40 | 0 | $840.00 | |
| 1/21/18 | 32 | 32 | 0 | $672.00 | |
| 1/28/18 | 24 | 24 | 0 | $504.00 | |

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($21/hr) | Evidence |
|---|---|---|---|---|---|
| 2/4/18 | 40 | 40 | 0 | $840.00 | |
| 2/11/18 | 32 | 32 | 0 | $672.00 | |
| | | | | | |
| **TOTAL FOR FABRICIO MARROQUIN** | | | | $4,494.00 | |

**ANTONIO MARTINEZ**

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($25/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 44 | 40 | 4 | $1,150.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39; Plaintiffs' Exs. 20A, 20H; Harvey- Cleary Exs. 2, 9;Testimony of Fabricio Marroquin, Trial Day 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 48 | 40 | 8 | $1,300.00 | |
| 1/21/18 | 40 | 40 | 0 | $1,000.00 | |
| 1/28/18 | 44 | 40 | 4 | $1,150.00 | |
| 2/4/18 | 40 | 40 | 0 | $1,000.00 | |
| 2/11/18 | 40 | 40 | 0 | $1,000.00 | |
| 2/18/18 | 40 | 40 | 0 | $1,000.00 | |
| 2/25/18 | 8 | 8 | 0 | $200.00 | |
| | | | | | |
| **TOTAL** | | | | $7,800.00 | |

**WILSON PANOZO**

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($21/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 34 | 34 | 0 | $714.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20I; Harvey-Cleary Exs. 2, 9; Testimony of Wilson Panozo, Trial Day 3; Testimony of Sally Dworak-Fisher, Trial Day 5; Plaintiffs' Ex. 40; Testimony |

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($21/hr) | Evidence |
|---|---|---|---|---|---|
| | | | | | of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 40 | 40 | 0 | $840.00 | |
| 1/21/18 | 32 | 32 | 0 | $672.00 | |
| 1/28/18 | 42 | 40 | 2 | $903.00 | |
| 2/4/18 | 32 | 32 | 0 | $672.00 | |
| 2/11/18 | 24 | 24 | 0 | $504.00 | |
| 2//18/18 | 24 | 24 | 0 | $504.00 | |
| 2/25/18 | 0 | 0 | 0 | $0.00 | |
| | | | | | |
| FIRST TOTAL | | | | $4,809.00 | |
| | | | | | |
| Mechanics Lien Offset | | | | $3,840.00 | |
| | | | | | |
| TOTAL FOR WILSON PANOZO | | | | $969.00 | |

## FREDY VERIZAGA PRADO

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($22/hr) | Evidence |
|---|---|---|---|---|---|
| 1/28/18 | 40 | 40 | 0 | $880.00 | Joint Exs. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20-L; Harvey-Cleary Exs. 2, 9; Testimony of Fredy Prado, Trial Day 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 2/4/18 | 39 | 39 | 0 | $858.00 | |
| | | | | | |
| TOTAL | | | | $1,738.00 | |

## JOSE F. REVELO

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($15/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 36 | 36 | 0 | $540.00 | Joint Ex. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20J; |

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($15/hr) | Evidence |
|---|---|---|---|---|---|
| | | | | | Harvey- Cleary Exs. 2, 9;Testimony of Jose Revelo, Trial Day 3; Testimony of Jacinto Garcia Romero, Trial Days 1-2 |
| 1/14/18 | 40 | 40 | 0 | $600.00 | |
| 1/21/18 | 40 | 40 | 0 | $600.00 | |
| 1/28/18 | 44 | 40 | 4 | $690.00 | |
| 2/4/18 | 40 | 40 | 0 | $600.00 | |
| 2/11/18 | 3 | 3 | 0 | $45.00 | |
| | | | | | |
| **TOTAL FOR JOSE F. REVELO** | | | | $3,075.00 | |

## JOSE ANTONIO TORRES

| Week Ending | Total Hrs. Allowed | Regular Hrs. | O/T Hrs. | Unpaid Wages ($25/hr) | Evidence |
|---|---|---|---|---|---|
| 1/7/18 | 36 | 36 | 0 | $900.00 | Joint Ex. 1, 29; Plaintiffs' Ex. 39, Plaintiffs' Exs. 20A, 20K; Harvey- Cleary Exs. 2, 9; Testimony of Wilson Panozo, Trial Day 3 |
| 1/14/18 | 48 | 40 | 8 | $1,300.00 | |
| 1/21/18 | 40 | 40 | 0 | $1,000.00 | |
| 1/28/18 | 44 | 40 | 4 | $1,150.00 | |
| 2/4/18 | 40 | 40 | 0 | $1,000.00 | |
| 2/11/18 | 40 | 40 | 0 | $1,000.00 | |
| 2/18/18 | 40 | 40 | 0 | $1,000.00 | |
| 2/25/18 | 16 | 16 | 0 | $400.00 | |
| | | | | | |
| **TOTAL** | | | | $7,750.00 | |

Clear credible evidence exists that Frank Marceron knew that Plaintiffs were working on the Project without being paid.  There was credible evidence adduced at trial that Harvey-Cleary knew that Plaintiffs were not being paid.

In sum, the Court awards unpaid regular and overtime wages as set forth above.  Harvey-Cleary, Frank Marceron, and TSCG are jointly and severally liable for those damages. [12]

### 3.  Enhanced Damages: Liquidated Damages

Both the FLSA and the MWHL provide that if an employer violate these statutes, the employer shall be liable to the employee for the amount of unpaid wages, plus an equal amount of "liquidated damages."  *See* 29 U.S.C. § 216(b); Md. Code. Ann., Lab. & Empl. §3-427(d)(1)(ii).

Both statutes also provide that a court enjoys discretion to not award liquidated damages-- or to reduce such an award-- if an employer demonstrates that it acted in "good faith." 29 U.S.C. § 260; Md. Code. Ann., Lab. & Empl. § 3-427(d)(2).

The employer has the "plain and substantial burden" to "persuade [a] court that the failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [the employer] more than a compensatory verdict."  *McCoy v. Transdev Services, Inc.*, Civ. No. DKC 19-2137, 2022 WL 951996, at *14 (D. Md. Mar. 30, 2022)(citing *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997)).  According to the law in this Circuit, an employer cannot ignore the law, the employer must "take active steps to ascertain the dictates of the FLSA and then move to comply with them."  *Braxton v. Jackson*, 782 F.App'x 240, 245 (4th Cir. 2019)(unpublished)(quoting *Reisch v. S. New England Telecomm Corp.*, 121 F.3d 58,71 (2nd Cir. 1997).  Put another way, the employer must demonstrate good faith by establishing a reasonable belief that there was a legal basis to not pay wages.  *Roy v. County of Lexington, South Carolina*, 141 F.3d 533, 548-49 (4th Cir. 1998).  Finally, the employer's burden of persuasion "is a difficult one to meet. . . and [d]ouble damages are the norm. . ."  *Rogers v. Sa. First Mort., LLC*, 362 F. Supp. 2d 624, 637 (D. Md. 2005).

---

[12] *See*  Note 2, *supra*.

Turning first to Defendant Marceron, he has not met his burden of establishing that he acted in good faith, i.e., that he entertained a reasonable belief that he had no legal obligation to pay the wages.  In this case, Defendant Marceron and his company, TSCG, hired the Plaintiffs, and he knew that they worked on the Gold's Gym Project until at least February 19, 2018.  Mr. Marceron communicated with Sara Haislipp, TSCG's bookkeeper, about the  timesheets submitted by Mr. Garcia Romero for the Plaintiffs, and he decided whether Plaintiffs were entitled to be paid for their work on the Project.  The credible evidence was that Mr. Marceron knew that Plaintiffs had not been paid for their work.  TSCG issued checks (without sufficient funds) that bore Mr. Marceron's signature on them, which is an admission by TSCG and Mr. Marceron of their obligation to pay the Plaintiffs for their work.  Mr. Marceron's promises to pay the Plaintiffs when he received additional monies from Harvey-Cleary also constitutes an admission of his obligation to pay Plaintiffs' outstanding wages.  In sum, Mr. Marceron has not met the high bar to establish that he acted in good faith. Plaintiffs are entitled to liquidated damages from Mr. Marceron. [13]

Turning to Harvey-Cleary, Defendant Harvey-Cleary argues that the Court should not impose liquidated damages under the FLSA or MWHL because it acted in good faith.  Specifically, Harvey-Cleary asserts in its pleadings that it "reasonably attempt[ed] to resolve this dispute a number of times," but that its concern about Plaintiffs' attorneys' fees and Plaintiffs' counsel's interest in making law on a what it calls a "troubling precedent" (general contractor liability for subcontractor's employees' wages) should be considered in deciding whether they acted in good faith.  (ECF No. 164, pp. 5, 26; *see also* Testimony of Joseph LaFonte, Trial Day 4).

As held previously, the Court has found that Harvey-Cleary was aware that Plaintiffs were not being paid for the work performed on the Gold's Gym Project. The Fourth Circuit has routinely

---

[13] TSCG is also liable to Plaintiffs for liquidated damages. *See* ECF No. 112; Note 2, *supra.*

upheld courts' awards of liquidated damages where the FLSA has been violated. *McCoy, supra,* 2022 WL 951996, at *14 (further citations omitted). Thus, this Court starts with the presumption that an award of liquidated damages is appropriate.

Next, the Fourth Circuit has interpreted the exemption found in 29 U.S.C. §260 "to place a plain and substantial burden upon the employer to persuade the court that the failure to obey the statue was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [the joint employer] more than a compensatory verdict." *McCoy, supra,* 2022 WL 951996, at *14 (citing *Mayhew, supra*, 125 F.3d at 220).

As a preliminary matter, Harvey-Cleary cites to no caselaw to support its arguments that concern about the amount of attorneys' fees to be awarded to a prevailing party in an FLSA action, or about efforts to make new law, constitute good faith.

In addition, the aggregate of Plaintiffs' wages is less than $50,000, and it was earned for work performed more than 5 years ago. Performance of that work inured to Harvey-Cleary's financial benefit. Moreover, Harvey-Cleary chose to pay some of TSCG's second-tier subcontractors that had not been paid for work performed on the Project. Even though neither the TSCG employees nor the second-tier subcontractor employees were hired directly by Harvey-Cleary, Harvey-Cleary paid the second-tier subcontractors, yet it did not pay any of the Plaintiffs at that time. Harvey-Cleary made a financial decision in February 2018 that benefited it. Had Harvey-Cleary paid at least some portion of those wages, either before or after litigation commenced, and left the question of attorneys' fees for resolution by the Court, perhaps the Court would view this differently. In sum, considering all of the aforementioned, Harvey-Cleary has not met its substantial burden to persuade the Court that it would be unfair to impose upon it liquidated damages. Plaintiffs are entitled to liquidated damages, and Harvey-Cleary is jointly and severally

liable for this category of damages.

### 4. Enhanced Damages: Treble Damages

Plaintiffs also seek treble damages under the MWPCL.  Before awarding up to treble damages, the Court must determine whether the wages were withheld pursuant to a "bona fide" dispute.  If an employer withholds wages from an employee in the absence of a bona fide dispute that an  obligation exists to pay that employee, then the MWPCL provides that a court may award the employee up to treble damages  Md. Code. Ann., Lab. & Empl. § 3-507.2(b)(1).  A "bona fide" dispute is a dispute "[where] the party making or resisting the claim has a good faith basis for doing so," or "there is a legitimate dispute over the validity of the claim or the amount that is owing." *Admiral Mortg., Inc. v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000).

For the reasons that the Court concluded that Defendant Marceron did not act in good faith, and the Court finds that the wage violations did not result from a bona fide dispute regarding payment amounts.  Regarding, Defendant Harvey-Cleary, the Court previously held that it did not have a good faith basis for not paying at least some portion--if not all of--Plaintiffs' wages.

One final issue to resolved.  It appears as though, in the District of Maryland, courts have routinely held that a plaintiff may recover either liquidated damages under the FLSA or treble damages pursuant to the MWPCL, but not both, in the absence of evidence of consequential damages suffered by a worker because of the underpayments or failure to pay wages.  *See, e.g., Ramirez v. 316 Charles,* LLC, Civ. No. SAG 19-3252, 2020 WL 7398807, at *9 (D. Md. Dec. 17, 2020)(quoting *Sanabria v. Cocody, Inc.,*  Civ. No. DKC 16-365, 2017 WL 3022990, at *4 (D. Md. July 17, 2017); *see also Clancy v. Skyline Grill, LLC*, Civ. No. ELH 12-1598, 2012 WL 5409733, at *8 (D. Md. Nov. 5, 2012); *see also Villatoro v. CTS & Assocs., Inc.*, Civ. No. DKC 14-1978, 2016 WL 2348003, at *3 (D. Md. May 4, 2016).

The Court has also reviewed *Peters v. Early Heathcare Giver, Inc.*, 439 Md. 646, 97 A.3d 621, 627 (2014), and *Admiral Mortg., Inc. v. Cooper,* 357 Md. 533, 745 A.2d 1026, 1033 (2000). The *Peters* Court has ruled that if a court determines that wages are withheld from a worker without a bona fide dispute, then this Court *may* exercise its discretion "regarding whether and in what amount to award a plaintiff employee enhanced damages." *Peters*, 97 A.3d at 628. Next, if the Court does decide to exercise its discretion, then, the *Peters* Court "encourages" this Court "to consider the remedial purpose of the [MWPCL] when deciding whether to award enhanced damages to employees." *Id.* Finally, the *Admiral Mortgage* Court has noted that an award of enhanced damages may be awarded "to compensate" a plaintiff for "significant consequences [that a plaintiff may face] from being unable to meet their own weekly or monthly obligations, ranging from embarrassment, to late charges, to repossessions, eviction. . . child support. . . ." *Admiral Mortg.*, 745 A.2d at 1034-35.

Having considered the aforementioned caselaw, the Court first finds it can choose to exercise its discretion or not choose to exercise its discretion when deciding to award enhanced damages under the MWPCL. *Peters*, 97 A.3d at 628. The Court further finds that if it does choose to exercise its discretion, then an enhanced damages award under the MWPCL may be awarded to compensate a plaintiff for consequential damages.

Regarding consequential damages, Defendant Harvey-Cleary made a pretrial *motion in limine* to preclude Plaintiffs from putting on evidence at trial of financial hardship, because Plaintiffs failed to raise the issue of consequential damages, e.g., the inability to meet financial obligations (like rent), at any point before May 2023 (i.e., well after the close of discovery and at the time of the pretrial conference). According to Defendant Harvey-Cleary, permitting Plaintiffs to introduce such evidence at trial would have prejudiced it, as it was deprived of addressing such

claims during discovery.  At the Pretrial Conference, Plaintiffs conceded that they had not raised the issued before discovery closed, and the Court granted Harvey-Cleary's *motion in limine*.  (ECF Nos. 142, 143).

To award consequential damages, then, a condition precedent is that a plaintiff needs to establish the existence of such damages.  This is consistent with *Ramirez, Sanabria, Clancy* and *Villatoro*.  Because the Court does not have any evidence related to consequential damages before it, it makes sense for the Court to follow the long history in this District of not awarding both double damages under the FLSA and treble damages under the MWPCL.

In sum, the Court awards the Plaintiffs liquidated damages under the MWHL in an amount equal to their unpaid wages, but declines to award treble damages.

### D.  MARCERON'S DECLARATORY JUDGMENT COUNTERCLAIM AGAINST JACINTO GARCIA ROMERO

As held previously in this Memorandum Opinion, the Court does not find that Jacinto Garcia Romero was also an employer as that term is understood under the FLSA, MWHL and MWPCL.  Accordingly, the Court declines to enter declaratory judgment in favor of Defendant Marceron on his counterclaim against Jacinto Garcia Romero.

### E.  HARVEY-CLEARY'S CROSSCLAIM AGAINST TSCG

As set forth herein, the Court has found Defendants Marceron and Harvey-Cleary liable for violations of the FLSA, MWHL, and MWPCL as an individual or joint employer, respectively. The Court has awarded damages as set forth herein.

Based on the credible evidence adduced at trial, and the reasonable inferences drawn therefrom, the Court finds that Defendant Harvey-Cleary has met its burden on its crossclaim against TSCG.  Specifically, the Court finds that TSCG materially breached the Subcontract, including by failing to pay Plaintiffs, its employees, for their work performed on the Gold's Gym

Project.

Regarding damages, to date, Harvey-Cleary has only argued in a general fashion that "to the extent that Harvey-Cleary is found liable for any portion of Plaintiffs' claims, TSCG must indemnify Harvey-Cleary for all costs associated with this action." (ECF No. 164, "p.5 of 29"). Harvey-Cleary's crossclaim as to TSCG also just generally pleads damages in the amount that exceeds $75,000. (ECF No. 20).

Accordingly, the Court reserves ruling on Harvey-Cleary's indemnification damages pending full briefing on this issue.

## F. MARCERON'S AMENDED CROSSCLAIM AGAINST HARVEY-CLEARY

Based on its analysis of all of the credible evidence adduced at trial, and the reasonable inferences drawn therefrom, the Court finds Defendant Marceron has failed to meet his burden on the Amended Crossclaim. Specifically, the Court holds that all of the Plaintiffs remained employed by TSCG until at least February 19, 2018, and that one or more of them continued to perform work on the Gold's Gym Project under the Subcontract until that date. The Court further finds that Plaintiffs were not fully paid for their wages and overtime wages due. Put another way, the Court has not found that Plaintiffs were told by Defendant Marceron to leave the Gold's Gym Project jobsite in or about early January 2018; they were just told to cease work on a certain portion of the Project's work related to "change orders." Next, the Court does not find that Plaintiffs ceased to be TSCG employees during the relevant period. Indeed, the evidence shows that as late as February 19-20, 2018, Frank Marceron was still communicating with Harvey-Cleary about TSCG employees' work on the Project.

Thus, there was credible evidence that Mr. Marceron and TSCG knew that Plaintiffs continued to work for TSCG until on or about February 20, 2018.

There was no evidence that Harvey-Cleary offered employment to any of the Plaintiffs provided that they would continue to work on the Project after January 2018. Rather, Plaintiffs were solely employed by TSCG.

Accordingly, the Court declines to enter judgment on Mr. Marceron's Amended crossclaim against Harvey-Cleary, and does not adjudge Harvey-Cleary liable under the theories of indemnity and/or contribution.

### G.  ATTORNEYS' FEES AND COSTS

Because Plaintiffs have prevailed on their claims, they are entitled to reasonable attorneys' fees and court costs. 29 U.S.C. § 216(b); Md. Code. Ann., Lab. & Empl. §§ 3-427(d)(1)(iii), 3-507(b)(1).

Plaintiffs may submit a request for reasonable attorneys' fees and costs consistent with the Local Rule 109 (D. Md. 2023), and opposition to that request must be filed in accordance with the Local Rules.

### III.    CONCLUSION

In sum, based on the aforementioned findings of fact and conclusions of law, the Court first finds that Jacinto Garcia Romero was not an employer of the Plaintiffs. Thus, the Court declines to enter a declaratory judgment to this effect. The Court next finds that judgment in favor of the Plaintiffs against Defendant Marceron and Defendant Harvey-Cleary is appropriate. Mr. Marceron was an employer of all of the Plaintiffs, and Harvey-Cleary jointly employed the Plaintiffs. TSCG was previously found to be an employer. Accordingly, Defendants Marceron, TSCG, and Harvey-Cleary are jointly and severally liable to Plaintiffs for unpaid wages and liquidated damages in the amounts set forth in the Order separately issued today.

The Court will defer ruling on Harvey-Cleary's indemnification crossclaim until it has received additional briefing. The Court will defer any award of attorneys' fees and costs until it has received the fee petition and the Defendants' responses thereto.

A separate Order follows.


Date: October 31, 2023                              _____/s/_____
                                                    The Honorable Gina L. Simms
                                                    United States Magistrate Judge